**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

THE STATE OF MICHIGAN; and THE PEOPLE OF THE STATE OF MICHIGAN,
Plaintiffs,

v.

BLUE CROSS BLUE SHIELD OF MICHIGAN MUTUAL INSURANCE COMPANY,
Defendant.

Case No.: 2:26-cv-13834

Judge:

**COMPLAINT**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS


I. INTRODUCTION ..... 1

A. Blue Cross Violated Antitrust Laws ..... 7

II. JURISDICTION AND VENUE ..... 13

III. PARTIES ..... 14

A. Plaintiffs ..... 14

B. Defendant ..... 15

C. Non-Party Co-Conspirators ..... 15

IV. BLUE CROSS ILLEGALLY CONSPIRED WITH THE OTHER BLUE CROSS AND BLUE SHIELD ENTITIES TO LIMIT COMPETITION ..... 17

A. TPA Services and the National Account Health Insurance Services Market ..... 17

B. The Provider Services Market ..... 31

C. History of the Co-Conspirators ..... 35

D. License Agreements and Restraints on Competition ..... 47

E. The Horizontal Agreements Not to Compete ..... 50

F. The Association License Agreements Have Injured Competition Throughout the United States, Including Michigan ..... 62

G. The Co-Conspirators' Conduct Has No Procompetitive Justifications ..... 65

V. BLUE CROSS'S CONDUCT HARMED THE STATE ..... 68

VI. BLUE CROSS'S CONDUCT HARMED MICHIGAN CONSUMERS STATEWIDE ..... 70

A. Blue Cross's Anticompetitive Conduct Has Harmed Michigan Healthcare Providers ..... 71

VII. CLAIMS FOR RELIEF ....................................................................81
VIII. PRAYER FOR RELIEF ...................................................................107
IX. JURY DEMAND ...........................................................................112

Plaintiffs, the State of Michigan ("Michigan" or "State") and the People of the State of Michigan ("People"), by and through their Attorney General, Dana Nessel, upon personal knowledge as to their own acts and beliefs, and upon information and belief as to all other matters, based upon the investigation of counsel, allege as follows against Defendant Blue Cross Blue Shield of Michigan:

## I. INTRODUCTION

1. The State of Michigan and the People of the State of Michigan bring this action to remedy Blue Cross Blue Shield of Michigan Mutual Insurance Company's ("Blue Cross") violations of antitrust laws. By this Complaint, the State addresses two independent types of harm Blue Cross has caused in the State.

2. First, Blue Cross conspired with other Blue Cross and Blue Shield entities to allocate customers and territories, to restrict output, and to eliminate competition for health insurance services. This illegal agreement prevented competition for the contract to administer State employees' medical benefit plan, which has allowed Blue Cross to overcharge the State for administering the State employee plans for years. The same conspiracy has also harmed the People of Michigan, on whose behalf the State sues in its *parens patriae* capacity, by depriving them of the choice and quality that a competitive market would provide, and by forcing Michigan employers and consumers to pay inflated premiums and higher out-of-pocket costs.

3. Second, Blue Cross abuses its dominant market position to drive the rates it pays healthcare providers to some of the lowest in the nation[1], including in some instances, payments at rates well below the providers' cost to provide necessary care.[2] Unable to obtain appropriate, market payments from Blue Cross, Michigan providers have been forced to reduce services, cut staff, close facilities, or exit the Michigan market entirely, degrading the healthcare infrastructure upon which Michigan residents depend and leading to the State's worsening health outcomes.

4. As owners of the Blue Cross Blue Shield Association (the "Association"), Blue Cross and the other Blue Cross and Blue Shield licensees (the "Co-Conspirator Insurance Companies") agreed among themselves and through the Association to eliminate competition for health insurance services to large employers like the State. This illegal conduct has caused the State and Michigan

---

[1] RAND Corporation, Nationwide Evaluation of Health Care Prices Paid by Private Health Plans: Findings from Round 5 (2022), https://www.rand.org/health/projects/hospital-pricing/round5.html; *see also* Eric Lopez et al., *How Much More Than Medicare Do Private Insurers Pay? A Review of the Literature*, Kaiser Fam. Found. (Apr. 2020), https://www.kff.org/medicare/how-much-more-than-medicare-do-private-insurers-pay-a-review-of-the-literature/.

[2] Kaiser Fam. Found., *Hospital Margins Rebounded in 2023, But Rural Hospitals and Those with High Medicaid Shares Were Struggling More Than Others* (Dec. 2024), https://www.kff.org/health-costs/hospital-margins-rebounded-in-2023-but-rural-hospitals-and-those-with-high-medicaid-shares-were-struggling-more-than-others/.

consumers to pay inflated prices for health insurance and medical benefit coverage while receiving diminished quality of care.

5. Blue Cross dominates Michigan's health insurance market. A 2025 American Medical Association report ranked Michigan fourth among states with the least competitive insurance markets, with Blue Cross controlling 65% of all health insurance products and 79% of the PPO market.[3] This market dominance allows Blue Cross to charge supracompetitive fees for third-party administrative services, to raise premiums, to suppress provider reimbursements, and to dictate terms to consumers and healthcare providers without meaningful competitive pressure.

6. Blue Cross's dominance is not the product of competition on the merits. Rather, Blue Cross has conspired with the other Co-Conspirator Insurance Companies, by, with, and through the Association, to allocate customers and territories, restrict output, and eliminate competition for health insurance services in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Sections 2 and 3 of the Michigan Antitrust Reform Act, MICH. COMP. LAWS §§ 445.772, 445.773. Through the Association's License Agreements, the Co-Conspirators have divided the market into exclusive geographic territories, adopted output-restricting

---

[3] José Guardado and Carol Kane, *Competition in Health Insurance: A Comprehensive Study of U.S. Markets*, AMERICAN MEDICAL ASSOCIATION (2025), https://www.ama-assn.org/system/files/competition-health-insurance-us-markets.pdf (The second largest insurer in the PPO category is Aetna with only 8% of the market).

National and Local Best Efforts Rules, and enforced a National Account Rule that precludes Co-Conspirator Insurance Companies from competing for accounts headquartered outside their allocated territories. These horizontal agreements among actual and potential competitors constitute *per se* illegal market allocation and output restrictions that have deprived the State and Michigan consumers of the benefits of free and open competition. The same horizontal agreements have also eliminated competition among the Co-Conspirator Insurance Companies for the purchase of healthcare services from Michigan providers.

7. Blue Cross's dominant market position constitutes monopoly power in the Michigan market for large group commercial health insurance services. Blue Cross has willfully acquired and maintained this monopoly power not through competition on the merits, superior products, or business acumen, but through its participation in the anticompetitive agreements described herein, including the market allocation scheme, output restrictions, and the National Account Rule, and other exclusionary conduct.

8. Blue Cross's dominant market position also constitutes monopsony power in the market for the purchase of healthcare services from Michigan providers. Blue Cross has willfully acquired and maintained this monopsony power not through competition on the merits, superior products, or business acumen, but through its participation in the anticompetitive agreements described herein,

including the market allocation scheme, output restrictions, and the National Account Rule.

9. Michigan consumers bear the cost of Blue Cross's unchecked market power. Blue Cross has implemented substantial premium increases that have materially burdened the State's healthcare delivery system. For 2026, Blue Cross filed 23.3%-24% annual increases for individual plan members, and 11.2% increases for small group markets.[4] Blue Cross is aware of its outsized market power, and used it to turn a profit at the expense of enrollees, stating "we're the only carrier offering plans in all 83 counties," while attempting to justify this historic hike in premiums.[5] More than 40% of Michigan small business owners say increasing healthcare costs are pushing them to the breaking point and they may have to drop health coverage altogether.[6] Over 65% of adults surveyed in 2025 experienced at least one healthcare affordability problem where they were forced to skip or delay

---

4 *2026 Michigan Health Insurance Rate Change Requests* (2025), https://www.michigan.gov/difs/-/media/Project/Websites/difs/OIRF/EHB/PDFs/2026_Approved_Rate_Changes.pdf.

5 Dustin Walsh, *Blue Cross Expects 'Chaos' in Marketplace Plans as Subsidies End and Competitors Leave*, CRAIN'S DETROIT BUSINESS (Oct. 29, 2025), https://www.crainsdetroit.com/health-care/michigan-aca-marketplace-health-insurance-premiums-could-triple/.

6 Mark Sanchez, *Double-Digit Premium Hikes Push Michigan Small Businesses to Reconsider Health Coverage*, CRAIN'S DETROIT BUSINESS (May 27, 2026), https://www.crainsdetroit.com/health-care/cgr-sbam-survey-20260526/.

medical care due to cost.[7] As a result, 690,000 Michiganders had medical debt between 2019 and 2021, a rate higher than the national average.[8]

10. Blue Cross's treatment of Michigan's flagship academic medical center illustrates its market power. Earlier this year, a highly publicized dispute between Blue Cross and Michigan Medicine arose when Blue Cross proposed an "unsustainable" 30% reduction in reimbursement rates, disrupting essential care for thousands of enrollees.[9] Blue Cross continues to reimburse providers at rates significantly lower than peer academic health systems.[10]

11. Blue Cross's dominance has driven competing insurers out of the Michigan market, forcing tens of thousands of Michiganders to scramble for new

---

[7] Altarum Healthcare Value Hub, *Michigan Survey Respondents Struggle to Afford High Health Care Costs, Worry About Affording Health Care in the Future, Express Bipartisan Support for Policy Solutions* (2025), https://healthcarevaluehub.org/wp-content/uploads/2025-Michigan-Affordability.pdf; Eli Newman, *Bridge Listens: Health Care Costs Climbing, Challenges Loom. What to Know*, BRIDGE MICHIGAN (Apr. 28, 2026), https://bridgemi.com/michigan-health-watch/bridge-listens-health-care-costs-climbing-challenges-loom-what-to-know/.

[8] Newman, *supra* note 7.

[9] Amaya Kuznicki, *Michigan Medicine, Blue Cross Negotiations Could Disrupt Care For Thousands: What to Know*, CLICK ON DETROIT (Mar. 5, 2026), https://www.clickondetroit.com/news/local/2026/03/05/could-be-life-threatening-michigan-medicine-blue-cross-negotiations-could-disrupt-care-for-thousands/; Eli Newman, *Blue Cross, Michigan Medicine Dispute Leaves 300,000 Patients in Lurch*, BRIDGE MICHIGAN (Mar. 4, 2026), https://bridgemi.com/michigan-health-watch/blue-cross-michigan-medicine-dispute-leaves-300000-patients-in-lurch/.

[10] Dustin Walsh, *UM, Blue Cross Reach a Payment Deal, Ending an Unusually Public Battle*, CRAIN'S DETROIT BUSINESS (May 27, 2026), https://www.crainsdetroit.com/health-care/cdb-um-bcbsm-contract-20260527/.

coverage in a diminishing pool of choices.[11] While this results in higher monetary costs and premiums for Michigan consumers, the consequences are also life-threatening: as just one example, Michigan's infant mortality rate increased significantly between 2018 and 2022,[12] while simultaneously, hospitals were forced to close labor and delivery units due to declining payer reimbursements.[13]

12. The State and the People bring this complaint to address Blue Cross's anticompetitive conduct and the resulting pervasive negative effects on the markets for large group commercial health insurance services and the purchase of healthcare services from providers, and to remedy the crisis faced by Michigan taxpayers, citizens, and employers.

**A. Blue Cross Violated Antitrust Laws**

13. The State and the People bring this action under applicable antitrust

---

[11] Eli Newman, *Michigan Health Care Woes: Insurers Leaving, Rates Rising, Subsidies in Limbo*, BRIDGE MICHIGAN (Oct. 24, 2025), https://bridgemi.com/michigan-health-watch/michigan-health-care-woes-insurers-leaving-rates-rising-subsidies-in-limbo/; *2026 Final Gross Rate Changes - Michigan: +20.1%; 2 More Carriers Leaving Market (Update)*, ACASIGNUPS.NET (Oct. 16, 2025), https://acasignups.net/rate_changes/2026/mi.

[12] *See 2025 Scorecard on State Health System Performance*, COMMONWEALTH FUND (June 18, 2025), https://www.commonwealthfund.org/publications/scorecard/2025/jun/2025-scorecard-state-health-system-performance.

[13] Eli Newman, *Sturgis closure may be 'first of more' for Michigan rural hospitals,* KING 5 (July 9, 2026), https://www.king5.com/article/syndication/associatedpress/sturgis-closure-may-be-first-of-more-for-michigan-rural-hospitals/616-d6bd2343-9fc6-44bb-ad75-47935f718708.

laws to address Blue Cross's anticompetitive conduct in two distinct but related markets. First, the State seeks to recover damages and other relief arising from a continuing conspiracy between and among Blue Cross and the Co-Conspirator Insurance Companies to restrict output, to allocate customers, and to fix prices across the United States in violation of the Sherman Act, 15 U.S.C. §§ 1, 2 and MICH. COMP. LAWS §§ 445.772-.773 (the "Blue Conspiracy"). As a result of the Blue Conspiracy, the State has paid artificially inflated prices for third-party administrative services purchased from Blue Cross for the State Health Plan (the "Plan"), which is administered by the Michigan Civil Service Commission, Employee Benefits Division, and which provides health and other benefits coverage to employees of the State (the "Plan Participants").

14. In addition, the State, acting in its *parens patriae* capacity, seeks to recover damages under the Michigan Antitrust Reform Act on behalf of the People of Michigan for the economic harm caused by Blue Cross's anticompetitive conduct. This harm includes not only the inflated premiums and higher out-of-pocket costs paid by Michigan consumers, but also the broader injury to Michigan's economy resulting from the suppression of competitive market conditions, including diminished consumer choice.

15. Second, the State and the People seek relief for the harm caused by the same conspiracy and by Blue Cross's monopoly and monopsony power in the market

for the purchase of healthcare services from Michigan providers. Through the anticompetitive conduct described herein, Blue Cross has suppressed provider reimbursement rates to anticompetitively low levels. The State, acting in its *parens patriae* capacity, seeks to recover damages under the Michigan Antitrust Reform Act on behalf of the People of Michigan, for the material degradation of the healthcare infrastructure upon which the People of Michigan depend.

16. Such damages include the difference between how much the State paid Blue Cross for administrative services and the lower competitive prices the State would have paid but for Blue Cross's illegal conduct, and the difference between how much Blue Cross paid providers for healthcare services and the higher competitive prices Blue Cross would have paid providers but for its illegal conduct. In addition, the State seeks *parens patriae* damages for the aggregate economic harm to Michigan resulting from the anticompetitive market conditions created by the conspiracy, which extends beyond direct premium overcharges to include injury to Michigan's economic welfare and diminished consumer choice.

17. Blue Cross has agreed with the Co-Conspirator Insurance Companies, by, with, and through the Blue Cross Blue Shield Association, to allocate customers and to refrain from competing against each other to provide Blue Cross and/or Blue Shield-branded health insurance services to such customers, including the State. In addition to allocating customers, Blue Cross, the Co-Conspirator Insurance

Companies, and the Association (together, the "Co-Conspirators") have combined and conspired to implement additional output-reducing restraints on the Co-Conspirator Insurance Companies' ability to compete against each other or other non-Blue Cross insurance competitors for the sale of health insurance services. Among other restrictive output-reducing agreements, the Co-Conspirators have agreed to adhere to (1) a National Best Efforts Rule, which precludes each Co-Conspirator Insurance Company from obtaining more than 33% of its revenue from the sale of services that do not carry a Blue Cross or Blue Shield brand or trademark; (2) a Local Best Efforts Rule, which requires that 80% of the revenue received by a Co-Conspirator Insurance Company from within an allocated territory come from the sale of services using a Blue Cross and/or Blue Shield mark; and (3) the National Account Rule, which precludes Co-Conspirator Insurance Companies from marketing or contracting with any National Account for Blue Cross- or Blue Shield-branded services unless the account's headquarters is located in the Co-Conspirator Insurance Company's allocated territory.

18. The Co-Conspirator Insurance Companies have also agreed they will not compete, negotiate price terms, or contract with healthcare providers outside of their respective geographic territories. This agreed-upon constraint applies even when Co-Conspirator Insurance Companies have a significant number of enrollees in another's territory.

19. The intent and effect of these measures is not only to ban all competition among the Co-Conspirator Insurance Companies but also to limit market entry into Michigan by prospective non-Blue rivals, so that Blue Cross may maintain its dominant position in both the market for large group commercial health insurance services and the market for the purchase of healthcare services from Michigan providers.

20. Through their anticompetitive conduct, Blue Cross and the Co-Conspirator Insurance Companies have been able to charge supracompetitive fees and prices to accounts like the State's and to suppress provider reimbursement rates to anticompetitively low levels. This anticompetitive behavior and the lack of competition that the Co-Conspirators engineered through their customer allocation scheme and output restrictions have caused the State to pay Blue Cross supracompetitive prices for health plan administration services and have enabled Blue Cross to underpay Michigan healthcare providers for the services they render.

21. Blue Cross would not have been able to charge these inflated prices and fees, or to suppress provider reimbursements to below-competitive levels, but for the illegal customer allocation scheme and/or output restrictions agreed on by the Co-Conspirators. The illegal conduct has had the actual and intended effect of restricting the ability of a significant portion of the nation's largest health insurance companies to compete with each other for the provision of health insurance services

to customers such as the State and for the purchase of healthcare services from providers such as Michigan's hospitals, physicians, and other healthcare professionals.

22. The Attorney General of Michigan has both statutory and common law authority to act in a *parens patriae* capacity to redress widespread harm to the State's citizens. *See, e.g.*, MICH. COMP. LAWS § 14.28 ("[T]he attorney general . . . may, when in his own judgment the interests of the state require it, intervene in and appear for the people of this state in any other court or tribunal, in any cause or matter, civil or criminal, in which the people of this state may be a party or interested."); *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982) (*parens patriae* is "inherent in the supreme power of every State . . . often necessary to be exercised in the interests of humanity, and for the prevention of injury to those who cannot protect themselves.").

23. The State brings this action on behalf of itself and on behalf of the residents, employers, employees, healthcare providers, and other persons in Michigan who have been harmed by Blue Cross's anticompetitive conduct (collectively, the "People of Michigan").

24. Blue Cross's anticompetitive conduct has harmed the People of Michigan by depriving them of the benefits of free and open competition in the market for health insurance and administrative services, imposing inflated costs on

employers and employees, suppressing provider reimbursement rates to anticompetitively low levels, driving providers to reduce services or exit the Michigan market, and worsening public health outcomes statewide.

25. The State thus asserts its *parens patriae* and sovereign standing to secure relief on behalf of the People of Michigan for these harms to the public interest.

26. Blue Cross's violations of antitrust laws cost the State and the People of Michigan millions of dollars.

## II. JURISDICTION AND VENUE

27. Subject matter jurisdiction exists pursuant to 28 U.S.C. §§ 1331 and 1337(a) because this action arises under the federal antitrust laws, including Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

28. Plaintiffs' state law claims are so related to the action over which this Court has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. As such, this Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

29. This Court has personal jurisdiction over Defendant because Defendant is incorporated, organized, and headquartered in the State of Michigan, maintains its

principal place of business in Detroit, Michigan, and transacts substantial business within the Eastern District of Michigan. The exercise of personal jurisdiction over Defendant comports with the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution.

30. Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 22 because Defendant resides, transacts business, and is found in this District, and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## III. PARTIES

### A. Plaintiffs

31. This action is brought for and on behalf of the sovereign State of Michigan and by the People of Michigan, by and through Dana Nessel, the duly elected and current Attorney General of the State, pursuant to applicable statutes, including MICH. COMP. LAWS § 14.28, and MICH. COMP. LAWS §§ 445.777-.778, and the common law and statutory authority of the Attorney General to represent the State.

32. Blue Cross serves as the Third Party Administrator for the Plan.

33. The State appears in this matter in its sovereign and *parens patriae* capacities to protect the economic and physical health and well-being of the People of Michigan, whose access to affordable and effective healthcare has been impaired

by Blue Cross's unlawful conduct. The State's *parens patriae* authority derives from the common law and is exercised here to vindicate the State's quasi-sovereign interest in the health and welfare of the People of Michigan. *See State v. Detroit Lumbermen's Ass'n, Inc.*, No. 79-904761-CZ, 1979 WL 18703, at *5 (Mich. Cir. Ct. Oct. 29, 1979) (holding that "*parens patriae* actions are derived from the common law, and are brought by a state under its *inherent* power to protect its sovereign or quasi-sovereign interest" in antitrust case).

**B. Defendant**

34. Blue Cross is the largest health insurer in the State of Michigan as measured by number of subscribers. It is a nonprofit healthcare corporation organized under the laws of the State of Michigan. The headquarters for Blue Cross are located at 600 E. Lafayette, Detroit, Michigan 48226.

**C. Non-Party Co-Conspirators**

35. The Association was created and maintained by the Co-Conspirator Insurance Companies in furtherance of the unlawful conspiracy. In particular, the Association has entered into agreements with Co-Conspirator Insurance Companies that control the geographic areas in which the individual Co-Conspirator Insurance Companies, including Blue Cross, can compete. Co-Conspirator Insurance Companies provide health insurance coverage for over 100 million Americans. The Co-Conspirator Insurance Companies are collectively the largest health insurer, as

measured by number of subscribers, in 44 states. Other Co-Conspirator Insurance Companies include: Elevance Health Companies, Inc. (through its Anthem subsidiaries); Blue Cross and Blue Shield of Alabama; Blue Cross Blue Shield of Tennessee, Inc.; GuideWell Mutual Holding Corporation and Blue Cross and Blue Shield of Florida, Inc. d/b/a Florida Blue; Health Care Service Corporation, a Mutual Legal Reserve Company d/b/a Blue Cross and Blue Shield of Illinois, Blue Cross and Blue Shield of Montana; Blue Cross and Blue Shield of New Mexico; Blue Cross and Blue Shield of Oklahoma; Blue Cross and Blue Shield of Texas, a Division of Health Care Service Corporation, a Mutual Legal Reserve Company; Highmark, Inc. and Highmark Health both d/b/a Highmark Blue Shield and Highmark Blue Cross Blue Shield; Highmark Blue Cross Blue Shield Delaware Inc. d/b/a Highmark Blue Cross Blue Shield Delaware, Highmark West Virginia Inc. d/b/a Highmark Blue Cross Blue Shield West Virginia; Highmark Inc. affiliates HealthNow New York Inc. and HealthNow Systems, Inc. together d/b/a Highmark Blue Cross Blue Shield of Western New York and f/d/b/a BlueCross BlueShield of Western New York and Highmark Blue Shield of Northeastern New York f/d/b/a BlueShield of Northeastern New York; USAble Mutual Insurance Company d/b/a Arkansas Blue Cross and Blue Shield and as Blue Advantage Administrators of Arkansas; and Wellmark, Inc.

36. Several of the Co-Conspirator Insurance Companies are or have been

registered to do business in the State of Michigan, including Blue Cross and Blue Shield of Illinois and Elevance Health. In addition to being registered to do business in the State of Michigan, several of the Co-Conspirator Insurance Companies are licensed by the Michigan Department of Insurance and Financial Services, including Wellpoint Insurance Company.

37. But for the anticompetitive agreements alleged herein, these and other Co-Conspirator Insurance Companies would compete in the Michigan market for the State's business and the business of the People of Michigan.

## IV. BLUE CROSS ILLEGALLY CONSPIRED WITH THE OTHER BLUE CROSS AND BLUE SHIELD ENTITIES TO LIMIT COMPETITION

### A. TPA Services and the National Account Health Insurance Services Market

38. The Co-Conspirator Insurance Companies offer a range of health insurance products to their customers. Large employers, however, do not purchase traditional health insurance where a premium is paid to the insurer and the insurer bears the risk of increased healthcare costs or the benefit from falling healthcare costs. Large employers generally "self-insure," meaning that the employers retain the obligation to pay healthcare providers for the care rendered to the employees and their families. Lacking the expertise to administer medical care plans, large employers retain third-party claims administrators or "TPAs," generally large health

insurance companies, to administer the employers' medical benefit plans in exchange for a monthly per-employee or per-member fee.[14]

39. The Co-Conspirator Insurance Companies and other health insurers and third-party administrators generally classify customers as "small group" or "large group" employers. Within the "large group" category, Co-Conspirator Insurance Companies and other insurance industry participants recognize large employers or plans typically covering 5,000 or more employees with employees in multiple states as a distinct group that is referred to as "National Accounts."[15] The sale of commercial health insurance services, including TPA Services and stop-loss insurance, to National Accounts ("National Account Health Insurance Services") is recognized as a distinct economic market by the individual Co-Conspirator Insurance Companies and other health insurers, many of which have separate business units dedicated to National Accounts. It is also recognized as a separate economic market by the consuming public, including National Accounts themselves. Sales of insurance services to National Accounts are not reasonably interchangeable

---

[14] Examples of National Account Health Insurance Services the State purchased from Co-Conspirators include: access to provider networks and negotiated rates; claims adjudication; explanation of benefits (EOB); claims/membership inquiry management; member enrollment services; actuarial and statistical services; reporting services; internet interfacing for members and employers; prior authorization services; telemedicine; HIPAA administration; managing ID cards and other member paperwork.

[15] The State has employees who live outside of Michigan.

with the sales of insurance services to smaller accounts and do not exhibit a high degree of cross-elasticity of demand with such accounts. This market is referred to herein as the "National Account Health Insurance Services" market.

40. By virtue of their size and geographic dispersion, National Accounts have unique needs and characteristics that have led the health insurance industry to treat them as a separate economic category with distinct services and pricing. Insurers identify and target National Accounts based on these attributes. Many other actors in the insurance space generally do not and cannot target National Accounts because servicing such accounts requires: (1) multi-state provider networks; (2) sophisticated claims administration systems capable of processing high volumes across multiple jurisdictions; and (3) infrastructure to navigate varying state regulations. Smaller regional insurers and independent TPAs lack the scale, network reach, and administrative capacity to meet these demands. Accordingly, only the Co-Conspirator Insurance Companies, UnitedHealthcare, Cigna, and Aetna are generally able to service the business of National Accounts. The Co-Conspirator Insurance Companies have at least a 50 percent share of the National Account market.

41. Virtually all National Accounts self-insure, which means they assume the risk and cost of covered medical services used by their covered individuals. National Accounts facilitate this self-insurance coverage by purchasing TPA

Services (services provided by third party administrators, or "TPAs") pursuant to which third parties (such as Co-Conspirator Insurance Companies) manage the day-to-day administration of customers' health plans and grant the covered individuals access to their medical provider network(s).

42. Payments for services from self-insured National Accounts to insurers under TPA contracts are known as "TPA fees." TPA fees form a significant part of the negotiations between TPA service providers and National Accounts, but they are not the only source of revenue and profit for the TPA service provider.

43. Competition among insurers for TPA National Account contracts allows employers, plan sponsors, plan administrators, trustees, and plans to obtain more favorable prices, provider networks, plan designs, and service levels.

44. There is a relevant product market for the sale of commercial health insurance services to National Accounts with 5,000 members or more spread across two or more states. The relevant geographic market is the entire United States. *See United States v. Anthem*, 236 F. Supp. 3d 171, 193-202 (D.D.C. 2017) (finding that the relevant product market for consideration of the proposed Anthem/Cigna merger was the sale of commercial health insurance to National Accounts with 5,000 employees or more spread across two or more states).

45. This relevant geographic market includes the submarket of the State of Michigan. Many of the Co-Conspirator Insurance Companies have the ability to

compete in all 50 states, including Michigan. For example, as measured by total enrollment, Elevance is the largest health insurer in the United States with approximately 45 million enrollees. The Co-Conspirator Insurance Companies have allocated Elevance the geographic areas of all or part of only 14 states to compete for commercial health insurance contracts. Elevance, however, also offers "green" (*i.e.*, non-Blue) insurance (discussed below), managed Medicaid and Medicare Advantage plans outside of its Exclusive Service Areas (defined below) through subsidiaries in many states, including Arizona, Florida, Georgia, Iowa, Maine, Maryland, Massachusetts, New Jersey, New Mexico, Pennsylvania, Texas, Washington, and the District of Columbia.

46. As an additional example, Health Care Service Corporation ("HCSC") operates in many states. It has an Exclusive Service Area of Illinois, New Mexico, Oklahoma, Texas, and Montana. It is the fourth largest health insurance company in the United States. HCSC could, and would, compete for commercial health insurance contracts outside of its Exclusive Service Area, but for the illegal territorial restraints and output restrictions alleged herein. For example, HCSC acquired Cigna's nationwide Medicare Advantage business which operates in many states other than HCSC's allocated five states. For these reasons, the United States, including the submarket of Michigan, are relevant geographic markets.

47. It is this relevant market made up of the above-described product

market and the above-described geographic markets that the unlawful conduct alleged herein has unreasonably injured.

48. Blue Cross is the only health insurer that contracts with most, if not all, of the major hospitals and health systems across Michigan. Moving the State Health Plan off the Blue Cross network would mean losing access to a critical mass of Michigan providers for State employees and retirees, making transition impractical and reinforcing Blue Cross's leverage over the State.

49. The State is a National Account as that term is commonly used in the insurance industry and has been defined by the applicable legal precedents. The State self-insures its State Health Plan and obtains TPA Services through invitations to negotiate, requests for proposals, and similar bidding processes ("ITNs" and "RFPs") and enters into National Account Health Insurance Services contracts. The State negotiated and entered into an agreement with Blue Cross for National Account Health Insurance Services, Contract No. 071B4300062 (the "Agreement").

50. As owners of the Association, Co-Conspirator Insurance Companies, both among themselves and with the Association, agreed to allocate customers and markets, to restrict output, and to eliminate the ability of Co-Conspirator Insurance Companies to compete against each other for the business of National Accounts. The illegal market or customer allocation and the output-reducing National Best Efforts Rule, Local Best Efforts Rule, and National Account Rule are enforced by

the Association through the Association license and membership agreements. Under those agreements, any Co-Conspirator Insurance Company that competes against one of its co-conspirators to obtain the business of a National Account contrary to their agreement could lose its license to use the Blue trade name and/or trademarks and would have to pay substantial penalties to the other Co-Conspirator Insurance Companies through the Association.

51. Pursuant to the Blue Conspiracy, each of the individual Co-Conspirator Insurance Companies enters into a license agreement with the Association to use the Blue brand to sell commercial health insurance services in an "exclusive service area" (each, an "Allocated Territory" or "Exclusive Service Area" or "ESA"). Under the rules agreed to by the Co-Conspirators, with certain limited exceptions, the Co-Conspirator Insurance Company allotted the Allocated Territory in which an employer or plan is headquartered is the only Co-Conspirator Insurance Company that is allowed to or will bid to provide insurance services to that employer or to other employers or plans located in the Allocated Territory. Each Co-Conspirator Insurance Company also explicitly agrees in the Association license agreement that it will not enter any territory allocated to another Co-Conspirator Insurance Company and compete against that Co-Conspirator by offering Blue-branded insurance services to any account that is headquartered in that territory. Even in the limited areas where the Allocated Territory of two Co-Conspirator

Insurance Companies overlap, all other Co-Conspirator Insurance Companies are prohibited from quoting employers or plans for insurance or TPA Services headquartered in those areas. These agreements, achieved through Association Rules and Association license agreements, are customer or territorial allocations among actual or potential horizontal competitors that are intended to prevent, and do, in fact, prevent, Co-Conspirator Insurance Companies from competing against each other by bidding for National Accounts headquartered outside of their Allocated Territory, including with respect to the State.

52. This elimination of competition has and continues to injure the State and the People of Michigan by causing them to overpay for National Account Health Insurance Services. Each time the State has sought bids for or sought to negotiate, renegotiate, or undertake a competitive market check of its TPA Services contract, the Co-Conspirator Insurance Companies have individually and jointly refused to compete for those contracts. The Co-Conspirator Insurance Companies routinely confirm their customer allocation agreement by continuing to participate in the Association and adhering to and enforcing the Association rules. Their illegal conduct has damaged and continues to damage the State (and other National Accounts) with regard to every RFP, negotiation, and/or market review process.

53. Many of the Co-Conspirator Insurance Companies have developed (or could develop) substantial non-Blue brands ("Green Competition") that could

compete with the Blue-branded products offered by the Co-Conspirator Insurance Companies. However, Association rules limit the output of Green Competition and restrict the ability of individual Co-Conspirator Insurance Companies to compete both outside and inside of their Allocated Territory under non-Blue brands, *i.e.*, the National Best Efforts Rule and the Local Best Efforts Rule. But for the illegal agreements to restrict output and allocate customers, the Co-Conspirator Insurance Companies could and would use their Blue brands and non-Blue brands to compete with each other for the business of the State, which would have resulted in greater competition and would have reduced prices paid by the State for National Account Health Insurance Services.

54. The Local Best Efforts Rule undermines competition in Michigan by compelling Blue Cross to prioritize Blue-branded business and limiting its ability to develop or market "Green Competition," or offerings made without using a Blue Cross or Blue Shield mark, that might otherwise compete on prices or provider networks for large groups in Michigan. The intent and effect are to entrench Blue Cross's market position.

55. The arbitrary allocation of exclusive service areas makes no economic sense, particularly in Michigan. For example, Michigan cities in the southwestern part of the state—including Niles, Dowagiac, and Cassopolis in Cass County—lie far closer to South Bend, Indiana (serviced by an HCSC subsidiary) than to Detroit,

Michigan.[16] According to the U.S. Census Bureau, Cass County is part of the South Bend-Mishawaka, IN-MI Metropolitan Statistical Area, which had a population of approximately 325,000 as of 2024.[17] Similarly, Michigan cities along the Ohio border, including Monroe and the surrounding Monroe County, are closer to Toledo, Ohio (serviced by a different Blue Cross entity) than to Detroit.[18] The Toledo, OH Metropolitan Statistical Area had a population of over 600,000 as of 2024.[19]

56. Similarly, Michigan's Upper Peninsula cities, such as Ironwood, Iron Mountain, and Menominee, lie far closer to major population centers in Wisconsin than to Detroit or Lansing. Yet under the Co-Conspirators' allocation scheme, residents in these areas are limited to Blue Cross Blue Shield of Michigan, despite their geographic proximity to Wisconsin-based Blue Cross entities that could otherwise compete for their business.

57. The Co-Conspirator Insurance Companies have a history of competing against each other in the few areas where such competition is not barred by the illegal

---

16 *See* U.S. Census Bureau, *Michigan 2020 Core Based Statistical Areas Map*, https://www2.census.gov/programs-surveys/metro-micro/reference-maps/2020/state-maps/26_Michigan_2020.pdf.

17 U.S. Census Bureau, *South Bend-Mishawaka, IN-MI Metro Area*, Census Reporter (2024), https://censusreporter.org/profiles/31000US43780-south-bend-mishawaka-in-mi-metro-area/.

18 *See* U.S. Census Bureau, *Monroe, MI Metro Area*, Census Reporter (2024), https://censusreporter.org/profiles/31000US33780-monroe-mi-metro-area/ (showing Monroe County constitutes its own statistical area separate from Detroit).

19 U.S. Census Bureau, *Toledo, OH Metro Area*, Census Reporter (2024), https://censusreporter.org/profiles/31000US45780-toledo-oh-metro-area/.

horizontal agreements alleged herein. For example, in Pennsylvania, when there were competing Blue Plans, one of the Co-Conspirators noted that competition resulted in "enormous downward pressure" on premium prices.

58. "One of the classic examples of a *per se* violation of [Federal antitrust laws] is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972).[20]

59. By creating and enforcing the allocation of National Accounts and the other anticompetitive rules and agreements of the Association, including the restrictive provisions of their respective license agreements with the Association, the Co-Conspirators have entered into *per se* illegal agreements in the National Account Health Insurance Services market.

60. The Co-Conspirator Insurance Companies exercise market power in the National Account Health Insurance Services market. The Co-Conspirator Insurance Companies cover 79% of all Fortune 100 companies, an indication of the market share and market power the Co-Conspirator Insurance Companies have in

---

[20] MICH. COMP. LAWS § 445.784(2) ("It is the intent of the legislature that in construing all sections of this act, the courts shall give due deference to interpretations given by the federal courts to comparable antitrust statutes, including, without limitation, the doctrine of per se violations and the rule of reason.").

the relevant market for National Accounts.[21] Collectively, the Co-Conspirator Insurance Companies control more than 50% of the relevant market. Furthermore, the Co-Conspirator Insurance Companies have the ability to raise prices significantly above the competitive level without losing so many sales as to make the price increase unprofitable.

61. The Michigan submarket for large group health insurance services is highly concentrated.[22] According to the Kaiser Family Foundation, as of 2024, Blue Cross held a 69% large group market share in Michigan, with a Herfindahl-Hirschman Index ("HHI") of 5,191 (more than two-and-a-half times the federal threshold for a highly concentrated market).[23] Only one other health insurance company held more than 10% of the large group market.[24]

---

[21] *100 Things to Know About Blue Cross Blue Shield*, Becker's Payer (Mar. 18, 2025), https://www.beckerspayer.com/payer/100-things-to-know-about-blue-cross-blue-shield/.

[22] Under the 2023 Merger Guidelines issued by the U.S. Department of Justice and Federal Trade Commission, a market with an HHI exceeding 1,800 points is considered highly concentrated. See U.S. Department of Justice & FTC, *Merger Guidelines § 2.1* (2023).

[23] *Large Group Insurance Market Competition, State Health Facts*, KAISER FAMILY FOUNDATION (last visited Sept. 28, 2026), https://www.kff.org/state-health-policy-data/state-indicator/large-group-insurance-market-competition/?currentTimeframe=0&selectedRows=%7B%22states%22:%7B%22michigan%22:%7B%7D%7D%7D&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

[24] *Market Share and Enrollment of Largest Three Insurers – Large Group Market*, KAISER FAMILY FOUNDATION (last visited Sept. 28, 2026), https://www.kff.org/state-health-policy-data/state-indicator/market-share-and-enrollment-of-largest-three-insurers-large-group-

62. Blue Cross's dominant market share, combined with its participation in the anticompetitive agreements alleged herein, demonstrates that Blue Cross possesses monopoly power in the Michigan market for large group commercial health insurance services; that is, the power to control prices or exclude competition.

63. The elasticity of demand and cross-elasticity of demand is very low in the National Account Health Insurance Services market. Large employers that provide health benefits to their employees have little choice other than to provide such benefits. Accordingly, a small but significant non-transitory increase in the price of insurance services will not cause National Accounts to stop purchasing such services or switch to a close substitute.

64. National Accounts, including the State, have fewer insurance choices than other TPA plans, small employers, or individuals purchasing health insurance because only Co-Conspirator Insurance Companies along with UnitedHealthcare, Cigna, and Aetna can service the vast majority of National Accounts. The Co-Conspirator Insurance Companies typically enjoy a market share of 2.5 times to 3 times the share of any other competitor in the National Account market and, as alleged above, in excess of 50% of the relevant market.

65. If reducing the number of competitors from four to three in the Anthem

---

market/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

Allocated Territory was sufficient to make the Anthem/Cigna merger anticompetitive, then restricting competition among all the Co-Conspirator Insurance Companies to reduce the number of competitors for National Accounts from dozens to only four likewise increases market power and permits anticompetitive abuse. Knowing that other competitors cannot bid for a National Account causes all the others to bid less aggressively.

66. If the market allocation and/or output restrictions were eliminated, then Co-Conspirator Insurance Companies would also compete to a greater extent for National Accounts in the relevant market. This would deconcentrate the relevant market because the Co-Conspirator Insurance Companies would exercise their newfound ability to bid on National Accounts in the Allocated Territory of other Co-Conspirator Insurance Companies. Prices would drop and the market for National Accounts would become much more competitive resulting in a significantly reduced HHI score. Eliminating the anticompetitive conduct would also improve quality by allowing National Accounts to seek out those Co-Conspirator Insurance Companies with superior services.

67. The Co-Conspirator Insurance Companies collectively use their market power to achieve anticompetitive results in the relevant market for National Accounts as is demonstrated by their ability to limit consumer choice, raise prices above the competitive level, and impose onerous terms on National Account

purchasers, all without losing market share.

68. At a minimum, Co-Conspirator Insurance Companies have exercised their collective market power in the relevant market for National Accounts to maintain that market power over National Accounts, even as their illegal and anticompetitive horizontal restraints limit output and restrict the State's choice to just Blue Cross.

69. Blue Cross has willfully acquired and maintained its monopoly power by participating in and enforcing the market allocation agreements, output restrictions, exclusionary practices, and other anticompetitive restraints described herein. But for these anticompetitive agreements, other Co-Conspirator Insurance Companies would compete for large group commercial health insurance services in Michigan, and Blue Cross would not possess the monopoly power it exercises today.

70. The Co-Conspirator Insurance Companies have, at a minimum, profitably instituted a small but significant and non-transitory increase in the price the Co-Conspirator Insurance Companies charge for health insurance services to National Accounts without losing collective market share or causing their companies to be less profitable, including Blue Cross's charges to the State.

**B. The Provider Services Market**

71. Outside of payments by the federal government and state governments in Medicare, Medicaid, and related government-sponsored programs, the majority

of healthcare services in Michigan are paid through or by commercial health insurance companies. Commercial health insurers like Blue Cross contract with healthcare service providers to purchase healthcare services for their enrollees. These contracted healthcare providers are referred to as "participating" or "in-network" providers.

72. The Co-Conspirator Insurance Companies participate in a distinct market for the purchase of healthcare services from providers (the "Provider Services Market"). In this market, health insurers are buyers and healthcare providers, including hospitals, physicians, and other medical service providers, are sellers. The product in this market consists of the healthcare services that providers deliver to patients, for which insurers pay providers, generally pursuant to contract language.

73. Healthcare providers compete for inclusion in the provider networks of insurers' plans. For a given healthcare provider, the question defining the product market is "Who are the payors with whom I can contract?" The answer for Michigan providers is the same regardless of provider type: Blue Cross, the few non-Blue national commercial insurers with a small presence in the State, the few non-Blue local insurers who lack a comprehensive statewide presence, and government programs including traditional Medicare, Medicare Advantage, and Medicaid.

74. The relevant geographic market for the Provider Services Market is the

State of Michigan. Healthcare providers in Michigan cannot practicably sell their services to out-of-state insurers as an alternative to contracting with Blue Cross because their patients, Michigan residents, require care delivered in Michigan. Michigan hospitals cannot relocate to serve patients in other states, and Michigan physicians cannot meaningfully shift their practices to serve insurers based elsewhere. As a result, Michigan healthcare providers are captive sellers who depend on insurers operating in Michigan for access to commercially insured patients.

75. Blue Cross possesses monopsony power, or buyer-side market power, in the Provider Services Market. Blue Cross's 65% share of all health insurance products and 79% share of the PPO market in Michigan[25] makes it the dominant commercial purchaser of healthcare services from Michigan providers.[26] No other private payor commands anything close to Blue Cross's share of the market. This overwhelming market share confers upon Blue Cross the power to control the prices it pays for healthcare services.

76. Blue Cross's anticompetitive practices and market power permit Blue Cross to pay in-network providers less than it would pay absent the antitrust violations alleged herein. Blue Cross pays in-network providers pursuant to provider

[25] *See supra* note 3.

[26] For purposes of this Complaint, "commercial" refers to medical coverage plans other than Medicare, Medicare Advantage, Medicaid, and other similar plans.

agreements. Precisely because of Blue Cross's market power within its Allocated Territory, providers wishing to join the Blue Cross network, and to access the Blue Cross-covered patient population, have limited bargaining power. Blue Cross gives the terms of the provider agreements, including the offered payments for medical services, on a "take it or leave it" basis. As a general matter, even on the limited occasions when negotiation of payment terms exists, it occurs within a very narrow range dictated by Blue Cross.

77. As discussed in more depth below, healthcare providers in Michigan have no meaningful alternative to contracting with Blue Cross. For most providers, Blue Cross enrollees constitute the majority of their commercially insured patient base. If a provider declines to participate in Blue Cross's network, that provider becomes "out-of-network" for approximately 65% to 79% of commercially insured patients in the State. Patients covered by Blue Cross who seek care from out-of-network providers face substantially higher out-of-pocket costs, potential balance billing exposure, and administrative burdens, causing many to seek care elsewhere. A provider that refuses Blue Cross's dictates therefore risks losing the majority of its commercially insured patients.

78. As a result of its monopsony power, which allows Blue Cross to suppress reimbursement rates to levels that would not prevail in a competitive market, Blue Cross generally pays providers significantly less than other commercial

payors for the same services.

79. The Co-Conspirator Insurance Companies collectively use their market power to achieve anticompetitive results in the Provider Services Market as demonstrated by their ability to limit provider choice, to fix prices below the competitive level, reimburse at below market rates, and to impose onerous terms on providers, all without losing market share.

80. At a minimum, Blue Cross has exercised its market power over the payment of healthcare providers in the Provider Services Market, even as the illegal and anticompetitive horizontal restraints limit output and restrict the options of Michigan healthcare providers to just Blue Cross within its Allocated Territory.

81. Blue Cross has, at a minimum, profitably instituted a small but significant and non-transitory decrease in the price Blue Cross pays for healthcare services to Michigan providers without losing market share or causing the company to be less profitable.

**C. History of the Co-Conspirators**

*a. Creation of the Blue Cross and Blue Shield Association*

82. Historically, the insurance companies using the Blue Cross and Blue Shield marks were fierce competitors.

83. Beginning in the 1930s, during the early years of their existence, there were no restrictions on the ability of a plan using the Blue Cross or Blue Shield

marks to compete with or offer coverage in an area already covered by another plan. "Cross-on-Cross" and "Shield-on-Shield" competition also flourished.

84. By the late 1940s, health insurance companies using a Blue mark faced growing competition not just from each other, but also from other insurance companies that had entered the market. Between 1940 and 1946, the number of hospitalization policies held by commercial insurance companies rose from 3.7 million to 14.3 million.

85. To counter the increasing competition, the Co-Conspirator Insurance Companies agreed to centralize the purported ownership of Blue marks that had become generic by that time.

86. In 1982, the Association was formed. At that time, the Association claimed to become the sole owner of the putative Blue Cross and Blue Shield trademarks and trade names that purportedly had previously been transferred by the Co-Conspirator Insurance Companies and their predecessor-competitors with whom they had merged or acquired.

87. In November 1982, after heated debate, the Association's member plans agreed to and promulgated two Association "propositions" (Proposition Nos. 1.1 and 1.2): (1.1) by the end of 1984, all existing insurance companies using a Blue mark would consolidate at a local level to form Blue Cross and Blue Shield plans; and (1.2) by the end of 1985, all insurance companies using a Blue mark within a

state would further consolidate, ensuring that each state would have only one BCBS competitor. Proposition 1.2 was justified as "a concentration of power and resources to allow us to maximize our effectiveness on all matters in which the several corporations should act collectively," including "decision-making" and "policy determination." As a result of these propositions, the number of insurance companies using the Blue mark declined sharply from 114 in 1980, to 77 in 1990, and now less than half that amount.

88. Even consolidation, however, did not end all competition between the coordinating insurance companies. In the early 1980s, for example, multiple insurance companies using Blue marks competed head-to-head in parts of New York.

89. From 1981 to 1986, the Co-Conspirator Insurance Companies lost market share of the market for the sale of healthcare insurance (both individual and group) to other healthcare insurance carriers (including other Co-Conspirator Insurance Companies competing under their non-Blue brands) at a rate of approximately one percent per year. At the same time, the amount of competition among Co-Conspirator Insurance Companies, including their subsidiaries operating without a Blue mark, increased substantially.

90. In April 1987, the member plans held an "Assembly of Plans"—a series of meetings held for the purpose of determining how they would and would

not compete against each other. During these meetings, these independent economic actors/health insurers and competitors agreed to recognize and maintain exclusive Allocated Territories when using the Blue brand, thereby eliminating "Blue on Blue" competition. However, the 1987 Assembly of Plans did not restrain competition by non-Blue branded plans of Co-Conspirator Insurance Companies—an increasing "problem" that caused complaints from many Co-Conspirator Insurance Companies.

91. After the 1986 revocation of the Co-Conspirator Insurance Companies' tax-exempt status and throughout the 1990s, the number of non-Blue branded plans of the Co-Conspirator Insurance Companies increased. These plans continued to compete with Blue-branded plans. As a result, the member/owners of the Association discussed ways to rein in the non-Blue branded output and resulting competition that was thwarting their market allocation scheme.

92. In 1996, the Co-Conspirator Insurance Companies voted to modify the Association rules to which the Association's members were subject by inserting a local "best efforts" requirement into the service mark licensing agreement that every Co-Conspirator Insurance Company signed. The new requirement, which was agreed to by all of the Co-Conspirator Insurance Companies, reads as follows: "[a]t least 80% of the annual Combined Local Net Revenue of a controlled affiliate attributable to healthcare plans and related services ... offered within the designated Service Area must be sold, marketed, administered or underwritten under the

Licensed Marks and Names."

93. The Co-Conspirator Insurance Companies also adopted and agreed to a restraint that required any Co-Conspirator Insurance Company that departed from the Association to pay an exit fee.[27]

94. The Co-Conspirator Insurance Companies also limited transfer rights by requiring prior Association review and facilitation of the establishment of a successor Blue Licensee.

95. Co-Conspirator Insurance Companies then turned their attention to a national "best efforts" requirement. A 51% national best efforts proposal, requiring that 51% of a Co-Conspirator Insurance Company's revenues come from the sale of Blue-branded services, was voted down in 2001. But an even more restrictive rule was proposed and presented in 2004 and later accepted and agreed to by the Co-Conspirator Insurance Companies and the Association. This National Best Efforts Rule is embodied in the following unlawful rule: "[a]t least 66-2/3% of the annual Combined National Net Revenue of the Controlled Affiliate[] attributable to healthcare plans and related services … must be sold, marketed, administered or underwritten under the Licensed Marks and Names. The percentage set forth in this

[27] Elevance Health, Inc., Annual Report (Form 10-K), Ex. 3 (Blue Cross License Agreement) ¶ 15(d)(iii) (Dec. 31, 2023) (describing the "Re-Establishment Fee" calculated on a per-enrollee basis that a terminated Co-Conspirator Insurance Company must pay to the Association).

paragraph shall not be changed for at least 10 years from the date of adoption of this paragraph." After these ten years expired (and during the relevant time period), the Co-Conspirator Insurance Companies agreed that the National Best Efforts Rule would be continued.

96. As a result of a district court opinion in 2021 holding that the National Best Efforts Rule and the Exclusive Service Areas combined were a *per se* violation of federal antitrust laws, the Association announced that it would abandon the National Best Efforts Rule. Since that occurred, however, neither Blue Cross nor any Co-Conspirator Insurance Company materially increased their revenue from non-Blue Cross Blue Shield branded business. The National Best Efforts Rule remains in effect *de facto*.

97. The Co-Conspirator Insurance Companies and the Association also enacted and agreed to anticompetitive restraints regarding the allocation of National Accounts amongst Co-Conspirator Insurance Companies. In a further effort to monetize their unlawful customer allocation, the Co-Conspirator Insurance Companies agreed through the Association that they could sell their exclusive territorial rights to provide services to purchasers headquartered in their allocated territory through a process known as ceding, whereby one Co-Conspirator Insurance Company can sell to another Co-Conspirator Insurance Company the right to contact, sell to, and service the members of a National Account headquartered in its

Allocated Territory for a price. In other words, a Co-Conspirator Insurance Company could sell to one and only one other Co-Conspirator Insurance Company the exclusive right to bid on a National Account, thereby ensuring that any National Account within any particular Co-Conspirator Insurance Company's Allocated Territory would have no more than one Co-Conspirator Insurance Company bid for its business.

98. The Co-Conspirator Insurance Companies did not need these restraints to service National Accounts. The Co-Conspirator Insurance Companies could have serviced National Accounts without conspiring to restrict competition and limit output. In fact, in the decades leading up to 2005, when the National Best Efforts Rule was adopted by the Association, the Co-Conspirator Insurance Companies did provide insurance services to National Accounts without the (anticompetitive) National Best Efforts Rule.

99. The fact of ceding—whereby a Co-Conspirator Insurance Company sells its right to bid on a National Account within its Allocated Territory to another Co-Conspirator Insurance Company—demonstrates the Co-Conspirators are capable and willing to provide service to National Accounts outside of their Allocated Territory and that the restraints are not necessary to service National Accounts.

100. Allocated Territories and customers are not necessary to serve National

Accounts, and any such purported necessity provides no justification for the allocation of National Account customers. When a Co-Conspirator Insurance Company services a National Account, it is already operating outside of its Allocated Territory.

101. The Co-Conspirators use the Allocated Territories to implement their customer allocation plan by dividing up National Accounts based upon the Allocated Territory in which the account is headquartered.

*b. Control of the Association by Co-Conspirator Insurance Companies*

102. On its website, the Association calls itself "a national association of 36 independent, community-based and locally operated Blue Cross and Blue Shield companies." It "grants licenses to independent companies to use the trademarks and names in exclusive geographic areas." The trademarks and trade names are the Blue Cross and Blue Shield trademarks, trade names and logos.

103. The Co-Conspirator Insurance Companies are the members and owners of the Association and collectively control and govern every aspect of the Association, including its rules and the terms of the license agreements that the Association enters into with its members. Each of the Co-Conspirator Insurance Companies agrees with each other and with the Association to adhere to the rules, regulations, and bylaws promulgated by the jointly owned and controlled Association.

104. The Co-Conspirator Insurance Companies are all independent health insurance companies that could and would compete with one another in the absence of the unlawful agreements alleged herein. To prevent such competition, Co-Conspirator Insurance Companies use the collective control they purport to have over certain Blue marks and names that they then license to the Co-Conspirator Insurance Companies on terms that the Co-Conspirators collectively agree upon. The Association is not a single entity but is instead a combination or conspiracy composed of the Co-Conspirator Insurance Companies. The Association's Board of Directors is comprised of one member from each of the Co-Conspirator Insurance Companies, plus the CEO of the Association.

105. Multiple federal courts have recognized that the Association lacks the characteristics of a single entity and is instead a cartel of competitors. For example, the court in *Central Benefits Mut. Ins. Co. v. Blue Cross & Blue Shield Ass'n*, 711 F. Supp. 1423, 1424-25 (S.D. Ohio 1989) held that the Association "is owned and controlled by the member plans." Another court held that the undisputed evidence shows that "the Blue Plans are 36 independent companies," each of which sells health insurance services; that each plan is "autonomous in its operations" and a "financially independent entit[y]" with its own profits and losses; and that Defendants are not "partners or joint ventures." *In re Blue Cross Blue Shield*

*Antitrust Litig.*, 308 F. Supp. 3d 1241, 1250 (N.D. Ala. 2018).[28]

106. The Rules of the Association are determined by a three-quarters weighted vote of its members and "each member Plan has agreed to be bound by the Association Rules." *Id.* The BCBS MDL court found that "the undisputed record evidence also reveals that the Blue Plans control the terms of each Blue's License Agreement" and that the Co-Conspirator Insurance Companies "vote on and approve amendments to the licensing agreements." *Id.* at 1267. The BCBS MDL court further found that each Co-Conspirator Insurance Company has entered into a license agreement with the collectively controlled Association. *Id.* at 1251. In each of those license agreements, the Association grants to each Co-Conspirator Insurance Company "an exclusive 'service area' where a Member Plan may use the Blue Marks" and, critically, each member is required to agree with the collectively controlled and owned Association that "it may not use the licensed Marks and Name outside the service area." *Id.*

107. The determination of where an individual Co-Conspirator Insurance Company will compete using a Blue mark and in what areas it will refrain from competing is not left to the "independent decision-making" of each licensee or to the independent decision-making of a holder of common-law trademark rights. To the

[28] The court is handling a series of antitrust class actions and related actions against the Association and the Blues that were assigned to it by the Judicial Panel on Multidistrict Litigation (the "BCBS MDL").

contrary, it is the Association that is composed of 36 separate economic entities, each with its own interest in preventing other members from directly competing with it, that formulated the rules that govern where and with whom each Co-Conspirator Insurance Company can compete. Clearly, each Co-Conspirator Insurance Company is a separate economic actor with its own economic interests to pursue who, by joining together with the Association, collectively decides how and where the licensees will compete and have deprived the marketplace of the independent centers of decision-making that competition requires. As a result, Blue Cross does not, as a matter of law, qualify for single-entity treatment as to the other Co-Conspirators.

108. The Government Accountability Office ("GAO") issued a detailed report on the operations of the Association in 1994 that was prepared with the cooperation of the Association.[29] The GAO's report described the governance structure of the Association as follows:

> As members of the Association, Blues plans collectively govern the Association's affairs pursuant to written bylaws. Under these bylaws, the Association is governed by a board of directors. The board of directors consists of the CEOs of most plans and the Association president. Plan representatives to the membership meetings may or may not be the plan CEO. For practical purposes, meetings of the Association's board of directors and its membership comprise largely

[29] Government Accountability Office, "Blue Cross and Blue Shield: Experiences of Weak Plans Underscore the Role of Effective State Oversight," Apr. 1994 ("GAO Report"), at 24, https://www.gao.gov/assets/hehs-94-71.pdf.

the same individuals.[30]

109. The current chair of the Board of Directors, Brian D. Pieninck, assumed leadership in November 2023 when he was also the president and chief executive officer of CareFirst BlueCross BlueShield. As of September 2025, he left CareFirst and is now the president and chief executive officer of GuideWell (Florida Blue).

110. The Board of Directors—comprised of Co-Conspirator Insurance Company executives—possesses the authority to amend or add rules, regulations, bylaws, and restraints on competition. The Board of Directors of the Association meets at least quarterly.

111. The governance structure of the Association is set out in its bylaws, which were approved by a vote of the Co-Conspirator Insurance Companies.

112. The Co-Conspirator Insurance Companies may amend or repeal the bylaws and adopt new bylaws. Likewise, they may revoke and return at any time the purported ownership of any marks or trade names registered to the Association.

113. The GAO Report also described the voting process used by the Association:

> Decisions on significant issues relevant to all plans are generally decided by a vote of the Association membership. Examples of significant issues include the termination of a plan's membership license or the amendment of the Association's bylaws. The membership voting process combines a straight vote—one member, one vote—and a weighted vote. Under weighted voting, each member

30 *Id.* at 24-25.

> plan is entitled to one vote for each $1,000 of annual dues it pays to the Association. Because dues are based on plan premium volume, the larger plans receive a greater number of weighted votes than smaller plans.
>
> For a membership vote to pass, the bylaws generally require a majority of both the straight and weighted votes of the members. However, this rule has exceptions. For example, the termination of a plan's trademark license requires at least three-fourths of the straight vote and three-fourths of the weighted vote rather than a simple majority. An amendment to the Association bylaws, on the other hand, requires one-half of the straight vote and two-thirds of the weighted vote.[31]

**D. License Agreements and Restraints on Competition**

114. As described above, the Association requires each Co-Conspirator Insurance Company to execute a purported license agreement with respect to its use of Blue service marks or trade names.

The GAO Report says that:

> To use the Blue Cross and Blue Shield names and trademarks, each Blues plan must sign a license agreement with the Association. The agreement does not constitute a partnership or joint venture, and the Association has no obligations for the debts of member plans.
> The license agreement restricts plans from using the trademark outside their prescribed service area to prevent competition among plans using the Blue Cross and Blue Shield names and trademarks.[32]

The "prescribed service area" is the "Allocated Territory" described above.

115. This collective enforcement of trademark "rights" is not the equivalent of individual enforcement of common-law trademark rights. Assuming Blue Cross

[31] *Id.* at 25-26.
[32] *Id.* at 28.

possessed common law rights to the Blue mark in the first instance (which is disputed), common-law trademark rights potentially give the holder the ability to exclude others from using the mark within a given territory. Co-Conspirator Insurance Companies, however, have gone far beyond granting that ability to each other. Co-Conspirators collectively through the Association also extract a promise from each other that it will not venture beyond its borders and compete against other Co-Conspirator Insurance Companies outside of its territory. 308 F. Supp. 3d at 1269. Each Co-Conspirator Insurance Company even agreed with the group that it could be fined or lose its rights altogether if it tried to break out of its territory and compete against another Co-Conspirator. *Id.* In other words, Co-Conspirator Insurance Companies agreed that each Allocated Territory would not only be an exclusive territory, but also a cage, beyond which the Co-Conspirator Insurance Company agreed with all the other Co-Conspirators it would not venture. There are no comparable common-law trademark rights that allow a horizontal group of competitors to agree none of them will go beyond their territory to compete against each other. Thus, the Association does not merely enforce previously purportedly-owned individual common-law trademark rights. It organizes a horizontal group promise that confines each licensee to provide services only to entities that happen to be in its own territory.

116. A bona fide individual common-law trademark holder can decide on its

own to enforce (or not enforce) its common-law trademark rights, but it is precisely the abandonment of that individual decision-making in favor of collective decision-making by a group of competitors that becomes a horizontal agreement among competitors within the meaning of Sections 1 and 2 of the Sherman Act, and MICH. COMP. LAWS §§ 445.772 and 445.773. Such a horizontal agreement that allocates territories among competitors using the same trademark is a *per se* violation of Sections 1 and 2 of the Sherman Act, and MICH. COMP. LAWS §§ 445.772 AND 445.773.

117. Co-Conspirator Insurance Companies as a group through the Association have decided by a 75% weighted vote (1) who will be allowed to use the Blue marks in exclusive territories and (2) that each Co-Conspirator must promise not to conduct business by using the BCBS marks and trade names beyond its own Allocated Territory.

118. If each individual Co-Conspirator Insurance Company still had its hypothesized common-law trademark rights, each could independently decide for itself whether to enforce or not enforce those common-law rights. Just as actually happened, two insurance companies, each with an exclusive Blue territory, could enter each other's Allocated Territory, but each independently decide not to object to the competition or to file suit. 308 F. Supp. 3d at 1253. Each might be happy to let the other into its territory so long as it could expand beyond its own borders.

Different Co-Conspirator Insurance Companies exercising these purported individual common-law rights could make different independent decisions—some more aggressive, some less so. Different settlements between them could be struck, or the parties could pursue the dispute to a judicial conclusion. And the asserted trademark and trade name rights could be found invalid or not infringed. All of these events would be determined by separate economic entities, each making its own independent decisions to best serve their individual economic interest. Co-Conspirator Insurance Companies, however, through their collective control of the Association have eliminated that individual decision-making and replaced it with group decision-making through the Association. Co-Conspirators' conduct is not the codifying of individually owned common-law rights. It is the transfer of those rights to a collectively controlled horizontal group, which eliminates the independent decision-making by competitors that is the essence of market competition.

119. As the foregoing demonstrates and as set forth in detail below, the Association is a vehicle used by independent health insurance companies to enter into horizontal agreements that restrain competition.

**E. The Horizontal Agreements Not to Compete**

120. Each Co-Conspirator Insurance Company is an independent legal entity. No Co-Conspirator Insurance Company has or had any franchise agreement with another Co-Conspirator Insurance Company. No Co-Conspirator Insurance

Company has or had any franchise agreement with the Association.

121. Each of the Co-Conspirator Insurance Companies is an independent economic actor. The Co-Conspirator Insurance Companies do not have common shareholders or ownership. Each has its own sales, revenue, and costs and makes its own profits and losses, which only benefit its own shareholders or stakeholders. Each Co-Conspirator Insurance Company is an actual or potential competitor of every other Co-Conspirator Insurance Company, as they all sell similar products and services and—but for the illegal acts alleged herein—could and would enter into each other's Allocated Territory to compete for the business therein, including for the State's account. As actual or potential competitors, each with its own profits and losses, the Co-Conspirator Insurance Companies, in the absence of the anticompetitive agreements alleged herein, each have an economic incentive to, and would, act as an independent center of economic decision-making. Each would compete against the other Co-Conspirator Insurance Companies for customers to increase its own sales and profits. The anticompetitive agreements alleged herein deprive the relevant market of the independent and competitive centers of decision-making that are necessary to full and free competition.

122. The restraints and regulations of the Association, including, but not limited to, the Blue Cross License Agreement and the Blue Shield License Agreement (collectively, the "License Agreements"), the Membership Standards

Applicable to Regular Members (the "Membership Standards"), and the Guidelines to Administer Membership Standards (the "Guidelines"), constitute horizontal agreements between competitors, Co-Conspirator Insurance Companies, to limit output and divide the geographic market for commercial healthcare insurance in the United States. As such, they are *per se* violations of Sections 1 and 2 of the Sherman Act, and of MICH. COMP. LAWS §§ 445.772 and 445.773.

123. The Association is a vehicle used by independent health insurance companies to enter into horizontal agreements that restrain competition. Because the Association is owned and controlled by the Co-Conspirator Insurance Companies, any agreement between the Association and a Co-Conspirator Insurance Company constitutes a horizontal agreement between and among the Co-Conspirator Insurance Companies themselves. As two economists told the FTC, "[t]he Blues collude almost perfectly. Blue Cross and Blue Shield plans agree upon geographical market areas with the assistance of their national associations."[33] This collusion later became even more pernicious with the advent of Allocated Territories and the "best efforts" requirements outlined above. As one legal scholar (Mark Hall of Wake Forest Law School) noted recently when referring to the structure of the

---

[33] *Competition in the Health Care Sector: Past, Present, and Future*, FEDERAL TRADE COMMISSION, 212 (Mar. 1978), https://www.ftc.gov/sites/default/files/documents/reports/competition-health-care-sector-past-present-and-future-proceedings-conference/197803healthcare.pdf.

Association and the various restraints at issue here, "[i]t's sort of antitrust law 101 that direct competitors can't agree to divvy up their territory."[34]

124. The License Agreements state that they "may be amended only by the affirmative vote of three-fourths of the Plans and three-fourths of the total then current weighted vote of all the Plans." Under the terms of the License Agreements, each Co-Conspirator Insurance Company "agrees . . . to comply with the Membership Standards."[35]

125. The Guidelines state that the Membership Standards and the Guidelines "were developed by the Plan Performance and Financial Standards Committee (PPFSC) and adopted by the Member Plans in November 1994 and initially became effective as of December 31, 1994"; that the Membership Standards "remain in effect until otherwise amended by the Member Plans"; that revisions to the Membership Standards "may only be made if approved by a three-fourths or greater affirmative Plan and Plan weighted vote"; that "new or revised guidelines shall not become effective . . . unless and until the Board of Directors approves them"; and that the "PPFSC routinely reviews" the Membership Standards and Guidelines "to

---

[34] Anna Wilde Mathews, *Antitrust Lawsuits Target Blue Cross Blue Shield*, THE WALL STREET JOURNAL (May 27, 2015), https://www.wsj.com/articles/antitrust-lawsuits-target-blue-cross-and-blue-shield-1432750106.

[35] *See* Def. Blue Cross and Blue Shield Association's Answer and Affirmative Defenses to Corrected Consol. Second Amended Provider Compl. ¶ 156, *BCBS MDL*, ECF No. 289.

ensure that . . . all requirements (standards and guidelines) are appropriate, adequate and enforceable."[36]

126. Co-Conspirators have divided the National Account and Provider Services markets into Allocated Territories assigned exclusively to distinct Co-Conspirator Insurance Companies such that only one of them can bid on any particular National Account and contract with providers within a given Exclusive Service Area. Through the License Agreements, Guidelines, and Membership Standards, which the Co-Conspirator Insurance Companies created, control, and enforce, each Co-Conspirator Insurance Company agrees that neither it nor its subsidiaries will compete under Blue Cross and Blue Shield marks or names outside of a designated Allocated Territory. The restraints and regulations imposed "by" the Association on the Co-Conspirator Insurance Companies are anticompetitive restraints and regulations negotiated by, and agreed to by and amongst, the Co-Conspirator Insurance Companies—all of which are or would be horizontal competitors but for the anticompetitive agreements alleged herein.

127. The License Agreement defines each Co-Conspirator Insurance Company's Allocated Territory as "the geographical area(s) served by the Plan on June 10, 1972, and/or as to which the Plan has been granted a subsequent license."

---

[36] *Id.* ¶ 157.

The Association has a "Map Book" which memorializes the Co-Conspirator Insurance Companies' defined service areas. Under the License Agreements, subject to certain exceptions related to National Accounts and Government Programs, Co-Conspirator Insurance Companies agreed that a "Plan may not use the Licensed Marks and Name outside the Service Area . . . ." These Map Books are not public record. They are considered by the Association to be "highly sensitive" and are distributed only to a limited number of employees, but each Co-Conspirator's allocated territory is both common knowledge and generally published by each Co-Conspirator.

128. Each Co-Conspirator Insurance Company entered into a License Agreement with the Association. All Co-Conspirators have enforced the Allocated Territories provided by the License Agreement. The Co-Conspirator Insurance Companies police the compliance of each other with the restraints and regulations of the Association. The Co-Conspirator Insurance Companies control and administer the disciplinary process for any Co-Conspirator Insurance Company that does not abide by the Association's restraints and regulations. The Co-Conspirator Insurance Companies control the termination of each other from the Association, including the loss of the putative "license" to use the Blue marks and trade name. The Co-Conspirator Insurance Companies have abided by the Allocated Territories and have refused to compete against each other to provide Blue-branded commercial

healthcare insurance to National Accounts.

129. In addition to allocating geographic markets through their use of Allocated Territories, the Co-Conspirators have developed additional rules which place added restraints on the Co-Conspirator Insurance Companies' ability to compete, and not only with each other. The Guidelines and Membership Standards, which Co-Conspirator Insurance Companies created, control, and enforce, and with which each must agree to comply as part of the License Agreements, establish two key output restrictions on non-Blue competition, which have been quoted above.

130. The National Best Efforts Rule and Local Best Efforts Rule, as described above, together place an output restriction on Co-Conspirator Insurance Companies' non-Blue business and limit the extent to which Co-Conspirator Insurance Companies can compete with other co-conspirator licensees under non-Blue marks, *i.e.,* green competition. These output restrictions directly limit the ability of each Co-Conspirator Insurance Company to compete and generate revenue from non-Blue branded, *i.e.,* green, business and thereby restrict each company's ability to develop non-Blue brands that could compete with Co-Conspirator Insurance Companies or non-Blue plans of the Co-Conspirator Insurance Companies and other insurance companies for National Account business. These provisions further discourage and disincentivize each Co-Conspirator from developing and competing through any non-Blue branded businesses.

131. The one-third cap on national non-Blue branded revenue reduces to a minimal level the incentive, if any, and the ability of each Co-Conspirator Insurance Company to compete outside of its Allocated Territory. To do so, the Co-Conspirator Insurance Company would have to buy, rent, or build a provider network under a non-Blue brand while ensuring that revenue derived from that brand did not exceed one-third of its national revenue. Thus, the potential upside of investing in developing business outside of a designated area is severely limited, which obviously discourages the investment needed to compete. Each Co-Conspirator Insurance Company also agreed that they would not develop a provider network outside of its Allocated Territory.

132. In sum, each Co-Conspirator Insurance Company has agreed with its actual or potential competitors that each of them will exercise the exclusive right to use the Blue brand within a designated geographic area, derive none of its revenue from services offered under the Blue brand outside of that area, and derive at most one-third of its revenue by offering services under a non-Blue brand. The latter amount will be further reduced if the licensee derives any of its revenue within its designated geographic area from services offered under a non-Blue brand. Together, these restrictions eliminate all Blue-branded competition among Co-Conspirator Insurance Companies for National Accounts and Provider Services, and severely limit non-Blue branded (or green) competition between Co-Conspirator Insurance

Companies for National Accounts and Provider Services.

133. The foregoing restrictions on the ability of Co-Conspirator Insurance Companies to generate revenue outside of their Allocated Territory constitute agreements between competitors to both limit output and allocate geographic markets and therefore are *per se* violations of Sections 1 and 2 of the Sherman Act, and of MICH. COMP. LAWS §§ 445.772 and 445.773.

134. Each Co-Conspirator Insurance Company has abided by the foregoing restrictions on the ability of Co-Conspirator Insurance Companies to generate revenue outside of their Allocated Territory during the relevant period.

135. The largest Co-Conspirator Insurance Company, Elevance, is a publicly traded company and has acknowledged the restrictions to which it continues to agree. In its Form 10-K for 2024, Elevance reported it does not "have a right to sell products and services using the BCBS names and marks outside of our exclusive service areas."[37] Elevance reported that it is "party to license agreements with the [Association]" that require Elevance "to comply with various requirements and restrictions regarding our operations and use of the BCBS names and marks," including "a requirement that at least 80% . . . of a licensee's annual combined local

[37] Elevance noted that certain large national commercial employers could request a second Blue plan bid in addition to a bid from a local Blue plan after September 2024 pursuant to the subscriber class settlement of the *In re Blue Cross Blue Shield Antitrust Litigation*.

net revenue, as defined by the [Association], attributable to healthcare plans and related services within its services area must be sold, marketed, administered or underwritten under the BCBS names and marks."

136. When asked by the Insurance Commissioner of Pennsylvania to "[p]lease describe any formal or informal limitations that BSBSA [sic] places on competition among holders of the [Blue] mark as to their use of subsidiaries that do not use the mark," the Association's general counsel responded that "BCBSA licensed companies may compete anywhere with non-Blue branded business . . . . The rules on what the plans do in this regard are contained in the license. However, the license terms themselves are proprietary to BCBSA, and . . . we would prefer not to share such trade secrets with BCBSA's competitors."[38]

137. The Co-Conspirator Insurance Companies have agreed amongst themselves and with the Association to impose harsh penalties on those that violate the territorial restraints or output restrictions.

138. According to the Guidelines, a Co-Conspirator Insurance Company that violates one of the territorial restraints could face "[l]icense and membership termination." If a Co-Conspirator Insurance Company's license and membership

---

[38] *See* Blue Cross and Blue Shield Association's Answer and Affirmative Defenses to Subscriber Track Amended Consol. Class Action Compl. ¶ 360, *BCBS MDL*, ECF No. 295.

are terminated, it loses the use of the Blue brands. In addition, in the event of termination, the Co-Conspirator Insurance Company must pay a Re-Establishment Fee to other Co-Conspirator Insurance Companies through the Association.

139. According to Elevance's 2024 10-K filing, the Re-Establishment Fee, which was $98.33 per enrollee, would be used to "fund the establishment of a replacement Blue Cross and/or Blue Shield licensee in the vacated area [*i.e.,* Allocated Territory]" and, were that amount applied to all of Elevance's enrollees in a Blue-branded plan as of December 31, 2024, Elevance would be assessed approximately $3 billion.

140. Similarly, in a published opinion, the United States District Court for the District of Columbia found that if Anthem (now Elevance) were to fail to comply with the "best efforts" rule and had to pay the re-establishment fee, the cost would be "close to $3 billion." *Anthem*, 236 F. Supp. 3d at 259 n.41. The re-establishment fee is sufficiently large to dissuade Co-Conspirator Insurance Companies from violating their collectively set restraints on competition and facing possible loss of their licenses.

141. In sum, a terminated Co-Conspirator Insurance Company would: (1) lose the brand through which it derived the majority of its revenue; and (2) fund the establishment of a competing health insurer that would replace it as the Co-Conspirator Insurance Company in its local area. These penalties amount to a threat

by the Association and Co-Conspirator Insurance Companies to put any individual Co-Conspirator Insurance Company that breaches the territorial restrictions out of business.

142. While many Co-Conspirator Insurance Companies and non-Blue competitors owned by such companies could and would compete effectively in each other's Allocated Territory but for the output and territorial restrictions, almost none of the non-Blue (green) competitors compete for National Accounts outside the agreed upon Allocated Territories.

143. With the narrow and limited exception of the injunctive relief afforded to certain, qualified non-governmental National Accounts provided by the "Second Blue Bid" framework established by settlement of the MDL Class Action, *In re Blue Cross Blue Shield Antitrust Litigation MDL 2406*, No. 2:13-cv-20000-RDP, since entering the License Agreement and absent a ceding agreement or other exception, no Co-Conspirator Insurance Company has competed under a Blue mark and/or trade name outside of its designated Allocated Territory.

144. The output and territorial restrictions for National Accounts agreed to by all Co-Conspirator Insurance Companies operate to restrain competition among the Co-Conspirator Insurance Companies with each other. These prohibitions on competition apply despite the efficiencies and economies of scale and reduced premiums that would result from multiple Co-Conspirator Insurance Companies

being able to bid for the State's account and other National Accounts. The result is that the State and other National Accounts have paid the Co-Conspirator Insurance Companies supracompetitive prices to purchase insurance services that have significantly exceeded the price they would have paid but for the unlawful conduct alleged herein.

145. These restraints on competition also reduce the quality of service offerings available to National Accounts, both by limiting the number of bids available to each National Account and also by reducing the incentives for all market participants to innovate and improve the quality of their offerings to compete for National Accounts.

### F. The Association License Agreements Have Injured Competition Throughout the United States, Including Michigan

146. The individual Co-Conspirator Insurance Companies, as licensees, members, and parts of the governing body of the Association, have conspired with each other (the member plans of the Association) and with the Association to create, approve, abide by, and enforce the restraints and regulations of the Association, including the *per se* illegal territorial and output restrictions in the License Agreements and Guidelines.

147. But for these illegal agreements, many of the individual Co-Conspirator Insurance Companies would otherwise be significant competitors of each other for National Accounts throughout the United States, including within Michigan, thereby

increasing output. Fifteen of the twenty-five largest health insurance companies in the country are Co-Conspirator Insurance Companies: if all of these companies, together with all other Co-Conspirator Insurance Companies, were able to compete with each other, then the result would be significantly lower prices for National Account TPA plans, including the State, and thus lower costs paid by the State.

148. During the relevant time period, Co-Conspirator Insurance Companies' illegal anticompetitive conduct has restrained competition for National Accounts, including the State, and significantly increased price by depriving the State of competition in the relevant market from one or more additional individual Co-Conspirator Insurance Companies at lower prices set by a competitive market that is free from the restraints imposed by the Co-Conspirators on the market.

149. During the relevant time period, Co-Conspirator Insurance Companies' illegal anticompetitive conduct has restrained competition for contracting and negotiating price terms with healthcare providers and significantly decreased prices paid for healthcare service by depriving providers of competition in the relevant market from one or more additional individual Co-Conspirator Insurance Companies at higher prices set by a competitive market that is free from the restraints imposed by the Co-Conspirators on the market. As a result of the decreased prices paid for healthcare services, healthcare providers' ability to provide healthcare services has been harmed, and patient choice has been reduced.

150. The Co-Conspirators themselves, in internal documents, have recognized the anticompetitive nature of their illegal conduct. For example, in a summary of conversations with four Blue CEOs from 1986, it is stated that "the major advantage" of Allocated Territories was "in the lessening of competition." *In re Blue Cross Blue Shield Antitrust Litig.*, 308 F. Supp. 3d 1241, 1253 (N.D. Ala. 2018). Further, a Co-Conspirator Insurance Company CEO stated, "[Blues] benefit from the exclusive service areas because it eliminates competition from other Blue Plans," and that without the exclusive service areas, "there would be open warfare." *Id.*

151. The illegal anticompetitive conduct of the Co-Conspirator Insurance Companies has also led to immense financial windfalls for the Co-Conspirator Insurance Companies and their executives. During the 1980s and afterwards, the Co-Conspirator Insurance Companies began to operate less like charitable entities and more like for-profit corporations, accumulating substantial surpluses. In 1986, Congress revoked the Blues' tax-exempt status, freeing them to form for-profit subsidiaries.

152. In 1992, the Association ceased requiring Co-Conspirator Insurance Companies to be not-for-profit entities. As a result, many Co-Conspirator Insurance Companies converted to for-profit status, leading to massive growth. While nominally still characterized as not-for-profit, a number of the individual Co-

Conspirator Insurance Companies generate substantial earnings and surpluses, and they pay their senior administrators and officials substantial salaries and bonuses—often in the multi-million dollar range.

### G. The Co-Conspirators' Conduct Has No Procompetitive Justifications

153. None of the purported justifications the Co-Conspirators may assert in defense of their market allocation scheme withstands scrutiny.

154. Allowing all Co-Conspirator Insurance Companies to bid on National Accounts within the existing Allocated Territories will not undermine the ability of Co-Conspirator Insurance Companies to service their local area. The Co-Conspirator Insurance Companies would remain free to focus on their local areas, and the existence of the Exclusive Service Areas does not enhance efficiency. Indeed, Co-Conspirator Insurance Companies already operate outside their Allocated Territories under non-Blue brands, demonstrating that competition across territorial lines is feasible. The very fact that the Co-Conspirator Insurance Companies worked in tandem with the Association to merge and operate statewide or broader demonstrates that the Co-Conspirator Insurance Companies are not focused, and need not be focused, on local areas, and this point is further bolstered by the existence of large, multi-state Co-Conspirator Insurance Companies like Anthem and HCSC.

155. The Co-Conspirators do not need the Allocated Territories or the best-

efforts restrictions to identify the source of any trademarked services or avoid confusion as to the source of any trademarked services among consumers. To the contrary, there are many significantly less restrictive means to eliminate any potential confusion as to the source of TPA Services, or other services, such as requiring that each Co-Conspirator use its actual name to identify the source of the services.

156. Whatever encouragement that the Allocated Territories provided individual Co-Conspirator Insurance Companies to promote the Blue brand within their Allocated Territories has no relationship to the scheme whereby a single Co-Conspirator Insurance Company is allocated the exclusive right to bid on a National Account with employees outside of that Co-Conspirator Insurance Company's Allocated Territory. The Allocated Territories could exist without allocating the National Accounts.

157. Likewise, the Exclusive Service Areas are unnecessary to protect the Blue marks or enable productive cooperation but instead are employed to reduce horizontal competition. As Co-Conspirator Insurance Companies themselves have admitted:

- "One CEO reported that 'Plans benefit from the exclusive services areas because it eliminates competition from other Blue Plans and that without service areas there would be open warfare.'" 308 F. Supp. 3d at 1253.
- "A summary of conversations with four Blue CEOs states 'the major advantage of an exclusive franchise area was seen in the lessening of

competition….'" *Id.*

- "Plan CEOs stated that ESAs create larger market share because other Blues stay out and do not fragment the market." *Id.*
- Co-Conspirators admit that their market allocation scheme is not necessary to protect the Blue Marks: "Unique issues arising in overlapping service areas can be addressed by reasonable interpretations of the Association rules and regulations, which preserve the integrity of the Brands yet allow Plans to coexist in overlapping service areas." *BCBS MDL*, ECF No. 1436-100 at 8; *BCBS MDL*, ECF No. 1436-77.
- The Association VP of Consumer Strategy stated that "Brands are not protected by the ESAs, but the ESAs protect the Plans' business model…." *BCBS MDL*, ECF No. 1436-82.
- Co-Conspirators admit that the effect of their market allocation is to suppress competition and that without it "Plans would not be able to protect themselves from out of area [Blue] competition" (*BCBS MDL*, ECF No. 1436-13 at BCBSF-00181534); and that "Plans benefit from the exclusive service areas because it eliminates competition from other Blue Plans." *BCBS MDL*, ECF No. 1436-19 at BCBSA 00083738.

Similarly, the BCBS MDL court found that the market allocation scheme does not further any new or unique product offering:

> Defendants cannot claim they produce a unique product. The market allocations at issue are not necessary to market, sell or produce health insurance…. The plan to go to ESAs constituted a new marketing/sales strategy, not a new product. The products remain exactly the same—commercial insurance and insurance services.

308 F. Supp. 3d at 1269-70.

158. The Exclusive Service Areas do not facilitate inter-brand competition. Although Co-Conspirator Insurance Companies sometimes use common trademarks, each is an independent competing producer of insurance services. 308 F. Supp. 3d at 1267. None of the Co-Conspirator Insurance Companies simply

distribute the products or services produced by others. Their market allocation scheme eliminates direct horizontal competition between firms that produce the service in question, *i.e.*, providing insurance services to National Accounts.

## V. BLUE CROSS'S CONDUCT HARMED THE STATE

159. As alleged above, Blue Cross and the Co-Conspirator Insurance Companies have conspired to allocate customers, restrict output, and eliminate competition in the market for National Account Health Insurance Services. This anticompetitive conduct has caused the State to pay Blue Cross supracompetitive prices for health insurance services.

160. Each time the State has sought bids for or sought to negotiate its TPA Services contract, the Co-Conspirator Insurance Companies have refused to compete. Their adherence to the Association's customer allocation agreement has damaged the State with regard to every RFP and negotiation process.

161. Blue Cross would not have been able to charge these inflated prices but for the illegal customer allocation scheme. Because the Co-Conspirators agreed not to compete for the State's business, the State lacked leverage to negotiate better rates, broader networks, or improved service levels. Blue Cross's market dominance enabled it to dictate terms without meaningful negotiation.

162. Blue Cross's lack of competitive pressure has also manifested in its administration of the Plan. Upon information and belief, Blue Cross has failed to

apply the same rigorous claims adjudication standards to the State's self-funded Plan that it applies to its own fully insured plans where Blue Cross's own money is at risk. As a result, the State has paid claims that were duplicative, facially defective, for excluded services, or otherwise should never have been approved. Blue Cross has also failed to pursue subrogation recoveries on behalf of the Plan, engaged in cross-plan offsetting practices that benefit Blue Cross's fully insured business at the Plan's expense, charged undisclosed "savings" fees, retained rebates and other revenue sources that should have been passed through to the State, and failed to provide complete data sets regarding processed and paid claims. These failures, which would not be tolerated in a competitive market, have compounded the harm caused by Blue Cross's supracompetitive pricing.

163. The conspirators' illegal actions have caused the State to increase its budget for employee health care, diverting taxpayer dollars away from essential State programs and services. In addition, as discussed below, Michigan's employees, who provide critical services to the public, have endured increased premiums and lower quality of care as a result of Blue Cross's conduct.

164. Blue Cross's market dominance has left the State without meaningful alternatives. Blue Cross's control over provider networks essential to serving State employees effectively forecloses competition from other insurers, while the output restrictions imposed by the National and Local Best Efforts Rules prevent Co-

Conspirators from offering competitive non-Blue alternatives. The result is that the State has been compelled to contract with Blue Cross on Blue Cross's terms, cycle after cycle.

## VI. BLUE CROSS'S CONDUCT HARMED MICHIGAN CONSUMERS STATEWIDE

165. Blue Cross's anticompetitive conduct has also harmed the People of Michigan by limiting their choices and driving up healthcare costs.

166. As a result of Blue Cross's conduct, the People of Michigan have paid higher premiums and faced reduced choice among insurers. In addition, Blue Cross's anticompetitive conduct has caused broader economic harm to the State of Michigan, depriving its residents of the benefits of competition, increasing costs, and diminishing the quality of healthcare statewide.

167. By agreeing with the Co-Conspirator Insurance Companies to allocate customers, Blue Cross has increased premiums for enrollees while decreasing access to providers. Michigan's taxpayers and public employees, who provide critical services to the public, have borne the costs of Blue Cross's misconduct, specifically through increased health insurance premiums, higher state expenditures, and lower quality of care. But the impact of these practices extends beyond public employees: as one example, small businesses struggle to secure affordable group coverage, individuals face unaffordable premiums in the individual marketplace, and consumers incur medical debt and forgo necessary care.

168. The cumulative impact of this anticompetitive conduct is the systematic deprivation of fair, affordable, and accessible health insurance and healthcare. The State's interests as *parens patriae* in protecting its economic welfare and the health and well-being of the People of Michigan constitute a reason for seeking the relief and damages described herein.

### A. Blue Cross's Anticompetitive Conduct Has Harmed Michigan Healthcare Providers

169. In addition to harming consumers through inflated premiums and reduced choice, Blue Cross has exercised its dominant market position to harm Michigan healthcare providers by suppressing reimbursement rates to anticompetitively low levels. Blue Cross's ability to suppress provider reimbursements derives both from its participation in the horizontal agreements alleged herein, which have eliminated competition and entrenched Blue Cross's dominant position in Michigan, and from its resulting monopsony power in the market for the purchase of healthcare services. Blue Cross's exercise of this buyer-side market power has injured providers and, ultimately, the People of Michigan by degrading the availability and quality of healthcare services throughout the State.

170. As set forth in Section IV.B above, the Provider Services Market consists of the market for the purchase of healthcare services from providers in the State of Michigan, in which health insurers are buyers and healthcare providers are sellers. Blue Cross possesses monopsony power in this market by virtue of its

dominant 65% to 79% share of commercial health insurance in Michigan, a dominant position that has been created and maintained by the horizontal agreements among the Co-Conspirator Insurance Companies to allocate territories and restrict competition.

171. Upon information and belief, Blue Cross's dominant market share enables it to effectively set the fee schedules and payment rates for healthcare services rendered by providers throughout Michigan. Because Blue Cross covers the majority of commercially insured patients in the State, its negotiated rates establish the baseline against which other payors measure their own reimbursements. Providers have little choice but to accept Blue Cross's rates, regardless of whether those rates adequately compensate them for the cost of care.

172. Upon information and belief, other commercial health insurers operating in Michigan have lowered their own reimbursement rates to match or closely track the rates paid by Blue Cross. Because Blue Cross holds the dominant market share, its below-market reimbursement rates exert downward pressure on the rates offered by competing insurers, who use Blue Cross's rates as a benchmark. As a result, Blue Cross's exercise of monopsony power has the effect of suppressing provider reimbursements across the entire Michigan commercial health insurance market, not just for Blue Cross's own members.

173. Healthcare providers in Michigan have no meaningful alternative to

contracting with Blue Cross. For most providers, Blue Cross enrollees constitute the majority of their commercially insured patient base. If a provider declines to participate in Blue Cross's network, that provider becomes "out-of-network" for the vast majority of commercially insured patients in the State. Patients covered by Blue Cross who seek care from out-of-network providers face substantially higher out-of-pocket costs, balance billing, and administrative burdens, causing many to seek care elsewhere. A provider that refuses Blue Cross's terms therefore risks losing the majority of its commercially insured patients.

174. Blue Cross has willfully acquired and maintained its monopsony power through exclusionary conduct, not through competition on the merits, superior offerings, or business acumen. Blue Cross's participation in the market allocation agreements, output restrictions, and other anticompetitive restraints described herein, including the Exclusive Service Areas, the National Best Efforts Rule, and the Local Best Efforts Rule, have shielded Blue Cross from competition that would otherwise erode its dominant position as a purchaser of healthcare services in Michigan. By eliminating competition from other Blue Cross and Blue Shield licensees and restricting the development of "Green Competition," Blue Cross has entrenched its buyer-side dominance over Michigan providers.

175. Blue Cross has exercised its monopsony power to suppress provider reimbursement rates to anticompetitively low levels. By leveraging its dominant

market position, Blue Cross has forced Michigan healthcare providers to accept reimbursement rates that are below competitive levels and, in many cases, below the actual cost of providing care. Providers have no practical ability to refuse these below-market rates because doing so would mean losing access to the majority of commercially insured patients in the State.

176. Blue Cross's dispute with Michigan Medicine in early 2026 illustrates its unlawful exercise of monopsony power. Michigan Medicine is the academic medical center affiliated with the University of Michigan and one of the State's flagship healthcare institutions. When Blue Cross proposed an unsustainable 30% reduction in reimbursement rates, the dispute threatened to disrupt essential care for approximately 300,000 patients who depend on Michigan Medicine for complex and specialized services.[39] Blue Cross's ability to dictate such terms to a major academic health system, and to put hundreds of thousands of patients at risk, demonstrates the extent of its buyer-side market power over Michigan providers.

177. Blue Cross's dispute with Michigan Medicine is not an isolated incident but part of a pattern of leveraging its market power against major health systems and coercing those systems into accepting below-market reimbursement rates. In 2011, Blue Cross engaged in a similar public dispute with Beaumont Health, which at the time accused the insurer of reimbursing the organization significantly less than its

---

[39] *See supra* note 9.

competitors by as much as 20%.[40] In 2002, Spectrum Health threatened to terminate its contract with Blue Cross over reimbursement rates.[41] In 2015, Bronson Healthcare demanded increased reimbursement from Blue Cross after the insurer's proposed rates threatened Bronson's financial viability; the dispute nearly resulted in Bronson leaving Blue Cross's network before a last-minute agreement was reached.[42] In each instance, Blue Cross's dominant market position allowed it to engage in brinkmanship that put patients at risk of losing access to care.

178. Upon information and belief, Blue Cross reimburses Michigan healthcare providers at rates significantly below the market rate for the services rendered. Blue Cross's reimbursement rates to Michigan providers are among the lowest in the nation relative to the cost of care, reflecting Blue Cross's exercise of monopsony power to extract below-market terms from providers who have no practical alternative to contracting with it.

179. Blue Cross suppresses provider reimbursement not only through contract negotiations, but also through unilateral policy changes that further reduce payments after contracts are signed. Blue Cross imposes these policies without providing any meaningful opportunity for providers to challenge or negotiate them.

---

40 Dustin Walsh, *Blue Cross Has a History of 11th-Hour Michigan Hospital Deals*, Crain's Detroit Bus. (May 12, 2026), https://www.crainsdetroit.com/health-care/cdb-um-bcbsm-contract-history-20260511/.

41 *Id.*

42 *Id.*

180. Blue Cross's emergency department downcoding policy, announced in February 2026, automatically reduces reimbursement for non-preventative evaluation and management services billed on the same day as certain procedure codes.[43] The downcoding occurs through an opaque algorithmic system[44] that, upon information and belief, evaluates only the claim itself without considering the underlying medical records that would justify the billed services. Blue Cross temporarily suspended the policy in April 2026 following complaints from providers, but has indicated it intends to resume downcoding in this manner.[45] Providers have reported significant reductions in emergency department reimbursements as a direct result of this policy.

181. Blue Cross's "site of care" policy similarly suppresses reimbursements by requiring that certain high-cost specialty drugs and infusion therapies be administered in lower-cost settings such as physician offices, independent infusion

---

[43] Blue Cross Blue Shield of Michigan, Provider Alert: Emergency Department E/M Coding (Oct. 16, 2025), https://providerinfo.bcbsm.com/documents/alerts/2025/202510/alert-20251016-ed-em-coding-mappo.pdf; Ayla Ellison, *BCBS Michigan to Cut 50% from Some E/M Payments with 'Modifier 25'*, Becker's Hosp. Rev. (Feb. 20, 2026), https://www.beckershospitalreview.com/finance/bcbs-michigan-to-cut-50-from-some-e-m-payments-with-modifier-25/; Mich. State Med. Soc'y, *BCBSM Pauses Implementation of Modifier 25 Policy* (Apr. 15, 2026), https://www.msms.org/news/bcbsm-pauses-implementation-modifier-25-policy.

[44] *See* Ellison, *supra* note 43.

[45] *Id.*

centers, or patients' homes, rather than in hospital outpatient facilities.[46] This policy effectively denies hospital-based providers the reimbursement they would otherwise receive for administering these medications and forces them to redirect patients to other facilities, creating additional barriers to care and disrupting the continuity of treatment for patients with complex medical conditions.

182. The disparity between Blue Cross's reimbursement rates and those paid by insurers in other states is stark. For inpatient services, Michigan Medicine receives approximately 163% of Medicare rates from Blue Cross, compared to an average of 206% of Medicare rates received by peer academic health systems, including Northwestern Medicine, Yale New Haven Health System, Emory Healthcare, Vanderbilt Health, Penn Medicine, Rush University System for Health, and UT Southwestern Medical Center, from their dominant insurers.[47] For outpatient care, the gap is even wider: Michigan Medicine receives approximately 212% of Medicare rates from Blue Cross, compared to 310% for its peer institutions.[48]

183. Blue Cross's monopsony power has contributed to the departure of

---

46 Blue Cross Blue Shield of Michigan, Provider Alert: Site of Care Program Update (Apr. 24, 2024), https://providerinfo.bcbsm.com/documents/alerts/2024/202404/alert-20240424-soc-aug-1-carelon.pdf.

47 Walsh, *supra* note 10.

48 *Id.*

healthcare providers from the Michigan market. Facing inadequate reimbursement that fails to cover the cost of care, some providers have reduced their participation in Blue Cross's network, limited the services they offer, or ceased operating in Michigan altogether.[49] Rural and underserved communities have been particularly affected, as providers in these areas operate on thin margins and are especially vulnerable to below-cost reimbursement.[50]

184. The exercise of Blue Cross's monopsony power has contributed to hospital closures and service reductions throughout Michigan. Hospitals facing inadequate reimbursement have been forced to shutter labor and delivery units, close emergency departments, and reduce staffing levels.[51] These closures have contributed to Michigan's worsening infant mortality rate, which increased between 2018 and 2022[52], and have left patients in rural and underserved areas without access to essential services.[53]

185. The closure of Sturgis Hospital on June 19, 2026, further exemplifies

---

[49] Anna Quider, *Michigan's rural hospitals closing, reducing service after Medicaid cuts*, Michigan Independent (Aug. 2026), https://michiganindependent.com/health-care/michigans-rural-hospitals-closing-reducing-service-after-medicaid-cuts; *see also* Ctr. for Healthcare Quality & Payment Reform, *Rural Hospitals At Risk of Closing* (July 2026), https://ruralhospitals.chqpr.org/downloads/Rural_Hospitals_at_Risk_of_Closing.pdf.

[50] *See supra* note 13.

[51] *See supra* notes 10, 13.

[52] *See supra* note 12.

[53] *See supra* note 13.

the consequences of inadequate reimbursement for rural healthcare. Sturgis Hospital, located in St. Joseph County, cited "declining reimbursement rates" as a primary cause of its closure.[54] The Michigan Health & Hospital Association called the closure "the canary in the coal mine moment for our rural hospitals."[55] A 2026 report from the Center for Healthcare Quality and Payment Reform identified ten rural hospitals in Michigan at risk of closing and three at "immediate risk" of closure, which would leave their communities without healthcare services.[56] The Sturgis closure eliminated all hospital departments and outpatient services in the community, including the emergency room, surgery, laboratory, medical imaging, physical therapy, cardiac rehabilitation, and clinics.[57]

186. In a competitive market for the purchase of healthcare services, Michigan providers would have alternatives to contracting with Blue Cross and could negotiate reimbursement rates that reflect the true value and cost of the services they provide. If multiple insurers competed vigorously for provider

---

[54] Mark Sanchez, *Sturgis Hospital closure fuels fears for rural care in Michigan*, Crain's Detroit Bus. (June 18, 2026), https://www.crainsdetroit.com/health-care/cgr-sturgis-hospital-closure-rural-healthcare-michigan-risk-20260617/.

[55] *Id.*

[56] Ctr. for Healthcare Quality & Payment Reform, *Rural Hospitals At Risk of Closing* (July 2026), https://ruralhospitals.chqpr.org/downloads/Rural_Hospitals_at_Risk_of_Closing.pdf.

[57] Sanchez, *supra* note 54.

participation, providers could decline below-cost contracts and contract instead with insurers offering fairer and better terms. Blue Cross's monopsony power deprives providers of this competitive alternative and allows Blue Cross to dictate below-market terms unilaterally.

187. Blue Cross's monopsony conduct has harmed not only providers but also the People of Michigan. By suppressing provider reimbursement to below-competitive levels, Blue Cross has degraded the healthcare infrastructure upon which Michigan residents depend. The closures, service reductions, and provider departures caused by Blue Cross's exercise of monopsony power have reduced access to care, increased wait times, and diminished the quality of healthcare services available to Michigan patients. These harms fall disproportionately on vulnerable populations, including those in rural areas, low-income communities, and communities of color.

188. Blue Cross's exercise of monopsony power ultimately harms Michigan consumers. When a dominant insurer like Blue Cross exercises buyer-side market power over providers, payments to providers and the quantity of healthcare services fall below competitive levels. Providers that cannot sustain artificially low reimbursement rates are forced to reduce services, cut staff, or close entirely, leaving consumers with fewer healthcare options, longer wait times, and reduced quality of care.

189. The State's interest as *parens patriae* in protecting the health and well-being of the People of Michigan encompasses the State's and the People's interests in maintaining a viable and sustainable healthcare delivery system. Blue Cross's exercise of monopsony power threatens that interest by degrading the healthcare infrastructure that serves Michigan residents and by driving providers out of the State. This harm also directly affects the tens of thousands of State employees and their dependents who are covered by the State's health plan and who rely on Michigan providers for their care.

## VII. CLAIMS FOR RELIEF

### COUNT ONE
### [VIOLATIONS OF THE SHERMAN ACT, 15 U.S.C. § 1]

190. The State and the People repeat and reallege the allegations in all Paragraphs above.

191. The State and the People bring this cause of action for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, against Blue Cross. Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

192. The License Agreements, Membership Standards, Rules, and Guidelines agreed to by the Co-Conspirators represent horizontal agreements entered into by and between the individual Co-Conspirator Insurance Companies,

all of whom are actual competitors or potential competitors in the market for National Accounts, including the State.

193. Each of the License Agreements, Membership Standards, Rules, and Guidelines entered into between the Association and the individual Co-Conspirator Insurance Companies represents a combination, contract, understanding or agreement within the meaning of Section 1 of the Sherman Act.

194. Through the License Agreements, Membership Standards, Rules, and Guidelines, the Co-Conspirators have combined, conspired, and agreed to limit output and allocate customers and geographic markets for the sale of commercial health insurance services. In particular, the Co-Conspirators have entered into horizontal combinations, conspiracies, or agreements among actual or potential competitors to: (1) allocate geographic territories or customers among Co-Conspirator Insurance Companies and decide through collective action that they will not compete against each other by using the Blue trademarks or trade names for the business of National Accounts; (2) adhere to the National Best Efforts Rule, which directly restricts the non-Blue output that each Co-Conspirator Insurance Company is allowed to offer to the market outside of its designated territory; and (3) adhere to the Local Best Efforts Rule, which directly restricts the non-Blue output that each Co-Conspirator Insurance Company can offer within its designated exclusive territory.

195. Each of the three horizontal agreements specified in the paragraph immediately above is a horizontal agreement among actual or potential competitors that constitutes a *per se* violation of Section 1 of the Sherman Act.

196. Further, the Co-Conspirator Insurance Companies have market power, *i.e.*, the power to profitably raise price above the competitive level, in the sale of U.S. health insurance services to National Accounts, the relevant geographic and product market alleged herein, *i.e.*, the National Accounts Health Insurance Services market, including the Michigan submarket.

197. Through the License Agreements, Membership Standards, Rules, and Guidelines, the Co-Conspirators have agreed to and have, in fact, restricted output and allocated customers, including the State, who purchase commercial health insurance services. By so doing, the Co-Conspirators have unreasonably injured competition in the relevant market for providing commercial health insurance services to National Accounts within the United States. In particular, the Co-Conspirators' allocation of geographic areas and/or customers and the output restrictions the Co-Conspirators have imposed on the market through the National Best Efforts Rule and Local Best Efforts Rule have significantly increased above the competitive level the price paid by National Accounts, including the State, for commercial healthcare insurance services in the United States. These output restriction agreements and market allocation agreements restrain trade in violation

of Section 1 of the Sherman Act.

198. The output restrictions and market allocation agreements entered into among the individual Co-Conspirator Insurance Companies (executed through the Association License Agreements and related Membership Standards and Guidelines) are not only *per se* illegal, but they are also unreasonably anticompetitive and violate the Rule of Reason.

199. Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant market, including but not limited to the following:

a) Allowing the Co-Conspirator Insurance Companies to artificially and unreasonably raise the prices charged to National Accounts substantially above the competitive level;
b) Substantially restricting output, especially with respect to non-Blue branded plans and competition; and
c) Depriving the State and others of the benefits of free and open competition, including a greater consumer choice, greater market entry, lower prices, and higher quality services.

200. The challenged anticompetitive agreements do not provide any procompetitive benefits. The restraints are also not necessary or ancillary to any purported joint venture among the Co-Conspirators. Furthermore, the anticompetitive agreements are neither ancillary nor necessary to any legitimate or procompetitive conduct or effect or to the ability of the Co-Conspirator Insurance Companies to offer commercial health insurance services under a Blue mark or name.

201. Nor does the anticompetitive conduct alleged herein reduce the cost of healthcare. To the contrary, the Co-Conspirators' horizontal agreements to allocate territories and restrict output have increased the cost of healthcare by eliminating competition and enabling supracompetitive pricing.

202. In addition, any possible procompetitive effects that could conceivably result from the output restraint and market allocation agreements alleged herein would be clearly and substantially outweighed by the anticompetitive effects detailed above. Furthermore, any possible procompetitive effects could be achieved by significantly less restrictive measures. The output restrictions and market allocation agreements in the License Agreements, Membership Standards, Rules, and Guidelines therefore are not only *per se* illegal, but also unreasonably restrain trade in violation of the Rule of Reason. The combination of, and agreements to, restrict output, allocate markets, and restrain trade adversely affects the State by depriving it, among other things, of the opportunity to purchase health insurance services from a lower cost competitor at a lower price set by a free market unencumbered by the Co-Conspirators' anticompetitive agreements. As a result of the Co-Conspirators' market allocation agreement, National Accounts Rule, National Best Efforts Rule, and Local Best Efforts Rule, the Co-Conspirator

Insurance Companies have not competed against each other for National Accounts and have been precluded by such agreement and restraints from doing so.

203. Likewise, the Co-Conspirator Insurance Companies have been precluded from competing for National Accounts both inside and outside of their respective Allocated Territory under non-Blue brands. This has prevented entry of Co-Conspirator Insurance Companies into the market for National Accounts, restricted the output of health insurance services, and raised the prices for such services substantially above what they would have been but for the illegal restraints.

204. As a direct and proximate result of the individual Co-Conspirator Insurance Companies and Blue Cross's continuing violations of Section 1 of the Sherman Act, as described above, the State has suffered antitrust injury. The State has directly paid higher than the competitive rate for services purchased from Blue Cross. These injuries have occurred on no less than a monthly basis and each payment to Blue Cross has caused injury to the State. Each overt act in furtherance of the conspiracy, including each contract renewal, each premium payment, and each enforcement of the territorial restrictions, constitutes a new and independent violation, and the statute of limitations runs separately from each such act.

205. Blue Cross is liable to the State and to the People for treble damages, costs of suit including reasonable attorneys' fees, declaratory and injunctive relief, and all other remedies available under 15 U.S.C. § 15.

## COUNT TWO
## [VIOLATIONS OF THE SHERMAN ACT, 15 U.S.C. § 2]

206. The State and the People repeat and reallege the allegations in all Paragraphs above.

207. The State and the People bring this cause of action for violations of the Sherman Act, 15 U.S.C. § 2, against Blue Cross.

208. Section 2 of the Sherman Act provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony."

209. Blue Cross, by and through its participation in the conspiracy alleged herein with the Co-Conspirator Insurance Companies and the Association, has combined and conspired to monopolize, and has in fact monopolized, the market for large group commercial health insurance services in Michigan, injuring the State directly.

210. Blue Cross's monopolization of, or attempt to monopolize, the market for large group commercial health insurance services in Michigan is evidenced by Blue Cross's dominant market share for large group commercial health insurance services in Michigan.

211. Blue Cross's adherence to and commitment to enforce the market-allocation requirements in the License Agreements, Membership Standards, Rules,

and Guidelines, and its agreements not to develop or pursue non-Blue-branded business, demonstrate its specific intent to entrench and perpetuate monopoly power in the Michigan market for large group commercial health insurance services.

212. Blue Cross has willfully acquired and maintained monopoly power in the relevant market through anticompetitive and exclusionary conduct, including the market allocation agreements, output restrictions, and the National Account Rule, rather than through competition on the merits, superior products, business acumen, or historic accident.

213. Blue Cross's monopoly power has enabled it to charge supracompetitive TPA fees and prices to the State and inflated premiums to Michigan employers and consumers. Blue Cross would not have been able to charge these inflated prices and fees but for the illegal customer allocation scheme and/or output restrictions agreed on by it and the Co-Conspirators.

214. Each time Blue Cross has imposed its supracompetitive TPA fees on the State, it intentionally exploits its dominant market position to impose monopoly overcharges that have no basis in competitive cost or quality justifications.

215. As a direct and proximate result of Blue Cross's continuing violations of Section 2 of the Sherman Act, as described above, the State has suffered injury in that it has directly paid higher than the competitive rate for services purchased from Blue Cross. These payments have occurred on no less than a monthly basis and each

separate payment to Blue Cross has caused a new injury to the State.

216. Blue Cross is liable to the State and to the People for treble damages, costs of suit including reasonable attorneys' fees, declaratory and injunctive relief, and all other remedies available under 15 U.S.C. § 15.

**COUNT THREE**
**[VIOLATIONS OF THE MICHIGAN ANTITRUST REFORM ACT, MICH. COMP. LAWS § 445.772]**

217. The State and the People repeat and reallege the allegations in all Paragraphs above.

218. The State and the People bring this cause of action for violations of the Michigan Antitrust Reform Act, MICH. COMP. LAWS § 445.772, against Blue Cross pursuant to its common law and *parens patriae* authority. Section 445.772 provides that "[a] contract, combination, or conspiracy between 2 or more persons in restraint of, or to monopolize, trade or commerce in a relevant market is unlawful."

219. The License Agreements, Membership Standards, Rules, and Guidelines agreed to by the Co-Conspirators represent horizontal agreements entered into by and between the individual Co-Conspirator Insurance Companies, all of whom are actual competitors or potential competitors in the market for National Accounts, including the State.

220. Each of the License Agreements, Membership Standards, Rules, and Guidelines entered into between the Association and the individual Co-Conspirator

Insurance Companies represents a combination, contract, understanding or agreement within the meaning of MICH. COMP. LAWS § 445.772.

221. Through the License Agreements, Membership Standards, Rules, and Guidelines, the Co-Conspirators have combined, conspired, and agreed to limit output and allocate customers and geographic markets for the sale of commercial health insurance services. In particular, the Co-Conspirators have entered into horizontal combinations, conspiracies, or agreements among actual or potential competitors to: (1) allocate geographic territories or customers among Co-Conspirator Insurance Companies and decide through collective action that they will not compete against each other by using the Blue trademarks or trade names for the business of National Accounts; (2) adhere to the National Best Efforts Rule, which directly restricts the non-Blue output that each Co-Conspirator Insurance Company is allowed to offer to the market outside of its designated territory; and (3) adhere to the Local Best Efforts Rule, which directly restricts the non-Blue output that each Co-Conspirator Insurance Company can offer within its designated exclusive territory.

222. Each of the three horizontal agreements specified in the paragraph immediately above is a horizontal agreement among actual or potential competitors that constitutes a *per se* violation of MICH. COMP. LAWS § 445.772.

223. Further, the Co-Conspirator Insurance Companies have market power,

*i.e.*, the power to profitably raise price above the competitive level, in the sale of U.S. health insurance services to National Accounts, the relevant geographic and product market alleged herein, *i.e.*, the National Accounts Health Insurance Services market, including the Michigan submarket.

224. Through the License Agreements, Membership Standards, Rules, and Guidelines, the Co-Conspirators have agreed to and have, in fact, restricted output and allocated customers, including the State, who purchase commercial health insurance services. By so doing, the Co-Conspirators have unreasonably injured competition in the relevant market for providing commercial health insurance services to National Accounts within the United States. In particular, the Co-Conspirators' allocation of geographic areas and/or customers and the output restrictions the Co-Conspirators have imposed on the market through the National Best Efforts Rule and Local Best Efforts Rule have significantly increased above the competitive level the price paid by National Accounts, including the State, for commercial healthcare insurance services in the United States. These output restriction agreements and market allocation agreements restrain trade in a way that violates MICH. COMP. LAWS § 445.772.

225. The output restrictions and market allocation agreements entered into among the individual Co-Conspirator Insurance Companies (executed through the Association License Agreements and related Membership Standards and

Guidelines) are not only *per se* illegal, but they are also unreasonably anticompetitive and violate the Rule of Reason.

226. Each of the challenged agreements has had substantial and unreasonable anticompetitive effects in the relevant market, including but not limited to the following:

a) Allowing the Co-Conspirator Insurance Companies to artificially and unreasonably raise the prices charged to National Accounts substantially above the competitive level;

b) Substantially restricting output, especially with respect to non-Blue branded plans and competition; and

c) Depriving the State and others of the benefits of free and open competition, including a greater consumer choice, greater market entry, lower prices, and higher quality services.

227. The challenged anticompetitive agreements do not provide any procompetitive benefits. The restraints are also not necessary or ancillary to any purported joint venture among the Co-Conspirators. Furthermore, the anticompetitive agreements are neither ancillary nor necessary to any legitimate or procompetitive conduct or effect or to the ability of the Co-Conspirator Insurance Companies to offer commercial health insurance services under a Blue mark or name.

228. Nor does the anticompetitive conduct alleged herein reduce the cost of healthcare within the meaning of MICH. COMP. LAWS § 445.774(6). To the contrary, the Co-Conspirators' horizontal agreements to allocate territories and restrict output have increased the cost of healthcare by eliminating competition and enabling

supracompetitive pricing.

229. In addition, any possible procompetitive effects that could conceivably result from the output restraint and market allocation agreements alleged herein would be clearly and substantially outweighed by the anticompetitive effects detailed above. Furthermore, any possible procompetitive effects could be achieved by significantly less restrictive measures. The output restrictions and market allocation agreements in the License Agreements, Membership Standards, Rules, and Guidelines therefore are not only *per se* illegal, but also unreasonably restrain trade in violation of the Rule of Reason. The combination of and agreements to restrict output, allocate markets, and restrain trade adversely affects the State by depriving it, among other things, of the opportunity to purchase health insurance services from a lower cost competitor at a lower price set by a free market unencumbered by the Co-Conspirators' anticompetitive agreements. As a result of the Co-Conspirators' market allocation agreement, National Accounts Rule, National Best Efforts Rule, and Local Best Efforts Rule, the Co-Conspirator Insurance Companies have not competed against each other for National Accounts and have been precluded by such agreement and restraints from doing so.

230. Likewise, the Co-Conspirator Insurance Companies have been precluded from competing for National Accounts both inside and outside of their respective Allocated Territory under non-Blue brands. This has prevented entry of

Co-Conspirator Insurance Companies into the market for National Accounts, restricted the output of health insurance services, and raised the prices for such services substantially above what they would have been but for the illegal restraints.

231. As a direct and proximate result of the individual Co-Conspirator Insurance Companies and Blue Cross's continuing violations of MICH. COMP. LAWS § 445.772 described above, the State and the People of Michigan have suffered antitrust injury. The State has directly paid higher than the competitive rate for services purchased from Blue Cross, and the People of Michigan have paid inflated premiums, higher out-of-pocket costs, and suffered reduced access to competitive health insurance options. These injuries have occurred on no less than a monthly basis and each payment to Blue Cross has caused injury to the State and the People of Michigan. Each overt act in furtherance of the conspiracy, including each contract renewal, each premium payment, and each enforcement of the territorial restrictions, constitutes a new and independent violation, and the statute of limitations runs separately from each such act.

232. Blue Cross's continuing violations of MICH. COMP. LAWS § 445.772 also directly injured the health and economic well-being of all or a substantial portion of the people of the State of Michigan.

233. As a result of Blue Cross's antitrust behavior, the State and the People of Michigan paid and continue to pay more in health insurance premiums and in out-

of-pocket expenses due to gaps in network coverage.

234. These acts or practices injured consumers in the State of Michigan by reducing access to care, inflating costs for essential healthcare services, and worsening health outcomes.

235. Blue Cross is liable to the State and to the People for actual damages, civil penalties, declaratory and injunctive relief, and all other remedies available under MICH. COMP. LAWS §§ 445.777, 445.778.

236. The State, acting as *parens patriae*, also seeks all losses suffered by the People of Michigan as a result of Blue Cross's anticompetitive practices pursuant to MICH. COMP. LAWS § 445.778.

**COUNT FOUR**
**[VIOLATIONS OF THE MICHIGAN ANTITRUST REFORM ACT, MICH. COMP. LAWS § 445.773]**

237. The State and the People repeat and reallege the allegations in all Paragraphs above.

238. The State and the People bring this cause of action for violations of the Michigan Antitrust Reform Act, MICH. COMP. LAWS § 445.773, against Blue Cross pursuant to its common law and *parens patriae* authority.

239. Section 445.773 provides that "[t]he establishment, maintenance, or use of a monopoly, or any attempt to establish a monopoly, of trade or commerce in a relevant market by any person, for the purpose of excluding or limiting competition

or controlling, fixing, or maintaining prices, is unlawful."

240. Blue Cross, by and through its participation in the conspiracy alleged herein with the Co-Conspirator Insurance Companies and the Association, has combined and conspired to monopolize, and has in fact monopolized, the market for large group commercial health insurance services in Michigan, injuring both the State directly and the People of Michigan.

241. Blue Cross's monopolization of, or attempt to monopolize, the market for large group commercial health insurance services in Michigan is evidenced by Blue Cross's dominant market share for large group commercial health insurance services in Michigan.

242. Blue Cross's adherence to and commitment to enforce the market-allocation requirements in the License Agreements, Membership Standards, Rules, and Guidelines, and its agreements not to develop or pursue non-Blue-branded business, demonstrate its specific intent to entrench and perpetuate monopoly power in the Michigan market for large group commercial health insurance services.

243. Blue Cross has willfully acquired and maintained monopoly power in the relevant market through anticompetitive and exclusionary conduct, including the market allocation agreements, output restrictions, and the National Account Rule, rather than through competition on the merits, superior products, business acumen, or historic accident.

244. Blue Cross's monopoly power has enabled it to charge supracompetitive TPA fees and prices to the State and inflated premiums to Michigan employers and consumers. Blue Cross would not have been able to charge these inflated prices and fees but for the illegal customer allocation scheme and/or output restrictions agreed on by it and the Co-Conspirators.

245. Each time Blue Cross has imposed its supracompetitive TPA fees on the State, it intentionally exploits its dominant market position to impose monopoly overcharges that have no basis in competitive cost or quality justifications.

246. As a direct and proximate result of Blue Cross's continuing violations of MICH. COMP. LAWS § 445.773 described above, the State has suffered injury in that it has directly paid higher than the competitive rate for services purchased from Blue Cross. These payments have occurred on no less than a monthly basis and each separate payment to Blue Cross has caused a new injury to the State. Michigan employers and consumers have likewise suffered injury by paying inflated premiums and experiencing reduced competition and choice in health insurance markets.

247. Blue Cross is liable to the State and to the People for actual damages, civil penalties, declaratory and injunctive relief, and all other remedies available under MICH. COMP. LAWS §§ 445.777, 445.778.

248. The State, acting as *parens patriae*, also seeks all losses suffered by the People of Michigan as a result of Blue Cross's anticompetitive practices pursuant to

MICH. COMP. LAWS § 445.778.

## COUNT FIVE
## [VIOLATIONS OF THE MICHIGAN ANTITRUST REFORM ACT, MICH. COMP. LAWS § 445.772]

249. The State and the People repeat and reallege the allegations in all Paragraphs above.

250. The State and the People bring this cause of action for violations of the Michigan Antitrust Reform Act, MICH. COMP. LAWS § 445.772, against Blue Cross pursuant to the State's common law and *parens patriae* authority.

251. The License Agreements, Membership Standards, Rules, and Guidelines agreed to by the Co-Conspirators represent horizontal agreements entered into by and between the individual Co-Conspirator Insurance Companies, all of whom are actual competitors or potential competitors in the market for the purchase of healthcare services from providers in Michigan.

252. Through the License Agreements, Membership Standards, Rules, and Guidelines, the Co-Conspirators have combined, conspired, and agreed to allocate geographic territories for the purchase of healthcare services from providers. By agreeing not to compete against each other in their respective Allocated Territories, the Co-Conspirators have eliminated competition that would otherwise exist for the purchase of healthcare services, enabling each Co-Conspirator Insurance Company to exercise buyer-side market power over providers within its territory.

253. But for the horizontal agreements among the Co-Conspirator Insurance Companies, Blue Cross would face competition from other Blue Cross and Blue Shield licensees for the purchase of healthcare services in Michigan. Such competition would increase the prices paid to Michigan healthcare providers, as competing insurers would bid up reimbursement rates to secure provider participation in their networks. The elimination of this competition through the territorial allocation agreements has enabled Blue Cross to suppress provider reimbursement rates to anticompetitively low levels.

254. Each of the horizontal agreements specified above is a horizontal agreement among actual or potential competitors that constitutes a *per se* violation of MICH. COMP. LAWS § 445.772. In the alternative, the horizontal agreements unreasonably restrain trade in the Provider Services Market in violation of the Rule of Reason.

255. As a direct and proximate result of Blue Cross's participation in the horizontal agreements described above, Michigan healthcare providers have suffered antitrust injury. Providers have been forced to accept below-market reimbursement rates, have reduced services and staffing, and in some cases have ceased operating in Michigan altogether. The People of Michigan have been harmed by the resulting degradation in the availability and quality of healthcare services throughout the State.

256. Blue Cross is liable to the State and to the People for actual damages, civil penalties, declaratory and injunctive relief, and all other remedies available under MICH. COMP. LAWS §§ 445.777, 445.778.

257. The State, acting as *parens patriae*, also seeks all losses suffered by the People of Michigan as a result of Blue Cross's anticompetitive practices pursuant to MICH. COMP. LAWS § 445.778.

**COUNT SIX**
**[MONOPSONIZATION IN VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT, MICH. COMP. LAWS § 445.773]**

258. The State and the People repeat and reallege the allegations in all Paragraphs above.

259. The State and the People bring this cause of action for monopsonization in violation of the Michigan Antitrust Reform Act, MICH. COMP. LAWS § 445.773, against Blue Cross pursuant to the State's common law and *parens patriae* authority.

260. Section 445.773 provides that "[t]he establishment, maintenance, or use of a monopoly, or any attempt to establish a monopoly, of trade or commerce in a relevant market by any person, for the purpose of excluding or limiting competition or controlling, fixing, or maintaining prices, is unlawful." This prohibition applies equally to monopsony, the power of a dominant buyer to control prices in a market for the purchase of goods or services.

261. Blue Cross possesses monopsony power in the market for the purchase of healthcare services from Michigan providers (the "Provider Services Market"). Blue Cross controls approximately 65% to 79% of the commercial health insurance market in Michigan, making it the dominant purchaser of healthcare services from Michigan providers. This overwhelming market share confers upon Blue Cross the power to control the prices it pays for healthcare services.

262. Blue Cross has willfully acquired and maintained its monopsony power through exclusionary conduct, including the market allocation agreements, output restrictions, and other anticompetitive restraints described herein, rather than through competition on the merits, superior products, or business acumen.

263. Blue Cross has exercised its monopsony power to suppress provider reimbursement rates to anticompetitively low levels, forcing Michigan healthcare providers to accept rates that are below competitive levels and, in many cases, below the actual cost of providing care.

264. Blue Cross's monopsonization of the Provider Services Market violates MICH. COMP. LAWS § 445.773. Blue Cross has established, maintained, and used its monopsony power for the purpose of controlling and fixing the prices it pays to Michigan healthcare providers at artificially low levels.

265. As a direct and proximate result of Blue Cross's monopsonization of the Provider Services Market, Michigan healthcare providers have suffered antitrust

injury in the form of below-competitive reimbursement rates. This harm has, in turn, injured the People of Michigan by reducing the availability, quality, and sustainability of healthcare services throughout the State.

266. Blue Cross is liable to the State and to the People for actual damages, civil penalties, declaratory and injunctive relief, and all other remedies available under MICH. COMP. LAWS §§ 445.777, 445.778.

267. The State, acting as *parens patriae*, also seeks all losses suffered by the People of Michigan as a result of Blue Cross's anticompetitive practices pursuant to MICH. COMP. LAWS § 445.778.

**COUNT SEVEN**
**[PUBLIC NUISANCE UNDER MICH. COMP. LAWS § 600.3801(3) AND COMMON LAW]**

268. The State and the People repeat and reallege the allegations in all Paragraphs above.

269. Blue Cross is liable for public nuisance because its conduct at issue has caused or contributed to an unreasonable interference with a right common to the general public. *Adkins v. Thomas Solvent Co.*, 440 Mich. 293, 303-305 (1992).

270. Blue Cross, as the dominant health insurer operating within the State of Michigan, has engaged in intentional and harmful practices with the aim and effect of suppressing competition in the health insurance marketplace. These unfair and anticompetitive practices include horizontally consolidating the market with other

Blue Cross and Blue Shield entities through an unlawful conspiracy; allocating customers and territories to eliminate competition; artificially inflating premiums and fees charged to Michigan employers, consumers, and the State; and driving competing insurers out of the Michigan market through deliberate plan design and restrictive agreements.

271. In so doing, Blue Cross created a public nuisance detrimental to the public health, safety, and welfare of the residents of the State of Michigan. Blue Cross's actions have resulted in inflated healthcare costs across the State, reduced access to affordable health insurance options, and diminished quality of care for Michigan residents, especially those in rural and medically underserved communities.

272. The health and safety of the citizens of the State, all of whom require access to affordable healthcare coverage, is a matter of great public interest and of legitimate concern to the State's citizens and residents.

273. Blue Cross's actions undermine the ability of Michigan employers to provide affordable health coverage to their employees, causing economic harm and imposing costs on businesses and families throughout the State.

274. The public nuisance created by Blue Cross's actions is substantial and unreasonable. It has caused and continues to cause significant harm to the community, and the harm inflicted outweighs any offsetting benefits.

275. Blue Cross, by its acts and omissions as described herein, substantially contributed to the health insurance access and affordability crisis discussed herein, and in so doing, created a public nuisance. Blue Cross knew or should have known that its behavior would create or substantially contribute to a public nuisance.

276. In addition and independently, Blue Cross's conduct invades a legally protected interest. Blue Cross's conduct constitutes an unreasonable interference because, *inter alia,* Blue Cross has violated Michigan antitrust law. *See* MICH. COMP. LAWS §§ 445.772-773.

277. The interference is unreasonable because Blue Cross's nuisance-creating conduct: (a) involves a significant interference with the public health, the public safety, the public peace, the public comfort, and/or the public convenience; (b) at all relevant times was and is proscribed by state and federal laws and regulations; and (c) is of a continuing nature and, as Blue Cross knows, has had and is continuing to have a significant effect upon rights common to the general public, including the public health, the public safety, the public peace, the public comfort, and/or the public convenience.

278. The public nuisance caused by Blue Cross has significantly harmed, and continues to significantly harm, a considerable number of, if not all, Michigan residents.

279. The People of Michigan have sustained injury because of the public nuisance described herein.

280. The People of Michigan have sustained specific and special injuries because damages include, *inter alia*, increased health insurance premiums and healthcare-related expenditures by residents, as described in this Complaint.

281. As a direct and proximate result of Blue Cross's intentional and/or negligent and reckless conduct and the public nuisance created by Blue Cross, public resources are being unreasonably consumed in providing healthcare services to Michigan residents who cannot afford coverage or necessary care, thereby eliminating available resources which would otherwise be used to serve the public at large in Michigan.

282. MICH. COMP. LAWS § 600.3801(3) provides that "[a]ll . . . nuisances shall be enjoined and abated as provided in this act and the court rules." Subsection (3) does not limit abatement to the specific nuisances listed in subsections (1) or (2), but applies to "[a]ll" nuisances.

283. Blue Cross's conduct constitutes a statutory public nuisance for the same reasons as set out above.

284. The State and the People seek all relief available under MICH. COMP. LAWS § 600.3801(3) and the common law, including injunctive relief, abatement, payment of monies necessary for abatement, damages, attorney fees and costs, and pre- and post-judgment interest.

**COUNT EIGHT**
**[UNJUST ENRICHMENT]**

285. The State and the People repeat and reallege the allegations in all Paragraphs above.

286. Under Michigan common law, a claim of unjust enrichment requires the plaintiff to establish (1) the defendant's receipt of a benefit from the plaintiff; and (2) an inequity resulting to the plaintiff because of the retention of the benefit by defendant. *Dumas v. Auto Club Ins. Ass'n*, 437 Mich. 521, 546 (1991).

287. As described herein, Blue Cross has obtained revenue and profits from its systematic and intentionally anticompetitive practices intended to suppress competition and artificially inflate health insurance premiums.

288. The State of Michigan, as a purchaser of third-party administration services from Blue Cross, has directly conferred a benefit on Blue Cross by paying inflated TPA fees that it would not have paid absent Blue Cross's anticompetitive conduct.

289. Blue Cross's anticompetitive practices have resulted in a significant financial gain for Blue Cross at the expense of the State, which has paid

supracompetitive TPA fees for health insurance administration services, as well as Michigan employers and consumers, who have paid inflated premiums and experienced reduced competition and choice in health insurance markets.

290. Blue Cross has been unjustly enriched by receiving these inflated TPA fees from the State of Michigan, which exceeded competitive market rates due to Blue Cross's market allocation, output restrictions, and anticompetitive conduct.

291. The State and the People are entitled to restitution equal to the amount of Blue Cross's unjust enrichment, representing the difference between the supracompetitive TPA fees the State paid for health insurance administration services and the lower competitive fees the State would have paid but for Blue Cross's unlawful conduct.

292. The State, also acting as *parens patriae*, is entitled to restitution to redress the economic harm caused to employers and consumers in the State of Michigan. Michigan employers and consumers have conferred a benefit on Blue Cross by paying inflated health insurance premiums that exceeded what they would have paid in a competitive market, and Blue Cross's retention of those excess payments is inequitable.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs the State of Michigan and the People of the State of Michigan pray that the Court grant the following relief:

A. Adjudge and decree that Defendant has violated Sections 1 and 2 of the Sherman Act and MICH. COMP. LAWS §§ 445.772, 445.773, through its participation in horizontal agreements to allocate customers and territories, restrict output, monopolize the market for large group health insurance services in Michigan, and monopsonize the market for the purchase of healthcare services from Michigan providers;

B. Permanently enjoin Defendant from continuing, maintaining, or renewing the anticompetitive conduct described herein, including enjoining Blue Cross from participating in any agreement, combination, or conspiracy to allocate customers or territories, restrict output, monopolize or attempt to monopolize trade or commerce, or otherwise restrain trade in violation of the Sherman Act and the Michigan Antitrust Reform Act;

C. Award the State and the People treble damages resulting from Defendant's violations of the Sherman Act, including the difference between the supracompetitive prices the State paid for health insurance services and the lower competitive prices the State would have paid but for Defendant's illegal conduct, pursuant to Clayton Act § 4, 15 U.S.C. § 15;

D. Award the State and the People all available damages allowed by reason of Defendant's violations of the Michigan Antitrust Reform Act, including the difference between the supracompetitive prices the State paid for health insurance

services and the lower competitive prices the State would have paid but for Defendant's illegal conduct, and the trebling of such damages;

E. Award the State, acting as *parens patriae*, all available damages under the Michigan Antitrust Reform Act for losses suffered by the People of Michigan as a result of Blue Cross's participation in the horizontal agreements, including the resulting imposition of supracompetitive prices as well as the broader economic harm to the State of Michigan resulting from the suppression of competitive market conditions;

F. Award the State, acting as *parens patriae*, all available damages under the Michigan Antitrust Reform Act for losses suffered by Michigan healthcare providers and the People of Michigan as a result of Blue Cross's participation in the horizontal agreements and the resulting suppression of provider reimbursements;

G. Assess civil penalties against Defendant of up to $50,000 for each violation of the Michigan Antitrust Reform Act pursuant to MICH. COMP. LAWS § 445.777;

H. Award the State and the People pre-judgment and post-judgment interest on all damages as determined by the Court pursuant to MICH. COMP. LAWS § 445.778;

I. Award the State and the People their taxable costs and reasonable attorneys' fees as provided by the Clayton Act § 4, 15 U.S.C. § 15 and MICH. COMP.

LAWS § 445.778;

J. Award restitution and disgorgement of all profits, benefits, and other compensation obtained by Defendant as a result of its unlawful conduct;

K. Require an accounting of all fees, profits, and other monies obtained by Defendant through its unlawful conduct;

L. Enjoin and abate the public nuisance created by Defendant's conduct, and award payment of monies necessary to abate such public nuisance pursuant to MICH. COMP. LAWS § 600.3801(3); and

M. Award such other and further relief as the Court deems just, necessary, and appropriate.

Dated: October 8, 2026

Respectfully submitted,

/s/ *Scott Mertens*
**MICHIGAN DEPARTMENT OF ATTORNEY GENERAL**
Scott Mertens (P60069)
MertensS@michigan.gov
Jonathan Comish (P86211)
ComishJ@michigan.gov
525 W. Ottawa Street
PO Box 30212
Lansing, MI 48933
517-335-7622

/s/ *Matthew J. Platkin*
Matthew J. Platkin *(pro hac vice to be filed)*
mplatkin@platkinllp.com
Angela Cai *(pro hac vice to be filed)*
acai@platkinllp.com

Aaron E. Haier *(pro hac vice to be filed)*
ahaier@platkinllp.com
**PLATKIN LLP**
1 Gateway Center, Suite 1150
Newark, NJ 07102
Tel. (973) 561-1950

/s/ *James H. Smith*
Jon Corey (*pro hac vice to be filed*)
**MCKOOL SMITH, P.C.**
1717 K Street, NW, Suite 1000
Washington, DC 20006
T: 202.370.8300
F: 202.370.8344
jcorey@mckoolsmith.com

James H. Smith
**MCKOOL SMITH, P.C.**
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
T: 212.402.9400
F: 212.402.9444
jsmith@mckoolsmith.com

**ATTORNEYS FOR PLAINTIFFS**

## IX. JURY DEMAND

NOW COME Plaintiffs, the State of Michigan and the People of the State of Michigan, by and through their Attorney General, Dana Nessel, and hereby respectfully demand a trial by jury in the above-entitled cause of action on all matters deemed so triable.

Dated: October 8, 2026

Respectfully submitted,

/s/ *Scott Mertens*
**MICHIGAN DEPARTMENT OF ATTORNEY GENERAL**
Scott Mertens (P60069)
MertensS@michigan.gov
Jonathan Comish (P86211)
ComishJ@michigan.gov
525 W. Ottawa Street
PO Box 30212
Lansing, MI 48933
517-335-7622

/s/ *Matthew J. Platkin*
Matthew J. Platkin *(pro hac vice to be filed)*
mplatkin@platkinllp.com
Angela Cai *(pro hac vice to be filed)*
acai@platkinllp.com
Aaron E. Haier *(pro hac vice to be filed)*
ahaier@platkinllp.com
**PLATKIN LLP**
1 Gateway Center, Suite 1150
Newark, NJ 07102
Tel. (973) 561-1950

/s/ *James H. Smith*
Jon Corey (*pro hac vice to be filed*)
**MCKOOL SMITH, P.C.**

1717 K Street, NW, Suite 1000
Washington, DC 20006
T: 202.370.8300
F: 202.370.8344
jcorey@mckoolsmith.com

James H. Smith
**MCKOOL SMITH, P.C.**
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
T: 212.402.9400
F: 212.402.9444
jsmith@mckoolsmith.com

**ATTORNEYS FOR PLAINTIFFS**